UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
No. 92-2171

BEIJING METALS & MINERALS
IMPORT/EXPORT CORPORATION,

Plaintiff-Appellee,

VERSUS

AMERICAN BUSINESS CENTER, INC., ET AL.,

Defendants,

AMERICAN BUSINESS CENTER, INC.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Texas

_____

(June 15, 1993)

Before WIENER, BARKSDALE, and DEMOSS, Circuit Judges.

BARKSDALE, Circuit Judge:

This appeal turns on the effect to be given two alleged oral agreements made contemporaneously with execution of a written payment agreement. American Business Center, Inc. (ABC), challenges a summary judgment granted Beijing Metals & Minerals Import/Export Corporation (MMB) on its severed claim to enforce the payment agreement, contending, *inter alia*, that the district court misapplied the parol evidence rule and, on issues such as fraudulent inducement, overlooked genuine issues of material fact. We **REVERSE** and **REMAND** on the issue of fraudulent inducement and

those pertaining to the quality and quantity of goods; as to all others, we **AFFIRM**.

I.

In 1988, MMB and ABC entered into a business relationship "in order to cooperatively develop the fitness [weight lifting] equipment market in the U. S. and Canada".[1]  ABC agreed to furnish MMB with "marketing information, customer names, product samples, and design prints for the research and development of products that [MMB] may be capable of manufacturing".  MMB, in turn, agreed to "engage in production only" and to "not sell the products designed and ordered by [ABC] to companies other than [ABC]".

MMB also agreed that goods would be manufactured in accordance with detailed specifications, and be of the highest quality.  But, according to ABC, from the very beginning, almost every shipment contained substantial amounts of defective and non-conforming goods; it notified MMB to that effect; it was assured that substitute goods would be sent; and it was instructed to retain the defective goods for later disposition.

For the shipments from MMB to ABC, the agreement originally required "documents against payment", obligating ABC to pay by letters of credit or upon presentation of bills of lading, prior to release of the goods from customs.  Accordingly, ABC paid for all shipments prior to receipt.  In 1988, the parties changed the payment terms to "document against acceptance", allowing ABC 90

---

[1]    MMB is a company formed and existing under the laws of the People's Republic of China.

days to pay (D/A 90). Of the shipments received on D/A 90 terms, ABC paid only approximately two invoices, and subsequently refused to pay for approximately 27 shipments totalling more than $1.2 million.[2]

In July 1989, MMB notified ABC that if it did not respond with a payment plan, MMB would not ship scheduled merchandise. Accordingly, that August, Mike Lian, president of ABC, travelled to Beijing, China, to meet with MMB.[3] After several days of negotiations, Lian signed an agreement, in which he acknowledged that ABC owed MMB $1,225,997.78,[4] of which $768,529.23 was overdue as of August 15, 1989. The agreement established a payment schedule, obligating ABC to pay the amounts owed MMB in specified installments. Before he left Beijing, Lian made the first agreed payment ($197,503.43) by check, post-dated to August 30.

ABC maintains that the payment schedule was only part of the total agreement; that MMB orally agreed to two other items: it would ship goods to compensate for non-conforming and defective goods and shortages and would begin making new shipments to ABC on D/A 90 terms, beginning September 10, 1989. Lian maintains that MMB representatives admitted that ABC had a substantial claim for defective and non-conforming goods, but that because the invoices

---

[2]    For all shipments, ABC ordered approximately $1.6 million in goods and made payments of approximately $300,000 - $400,000.

[3]    Lian, a native of Taiwan, travelled to Beijing in connection with a trip to Taiwan.

[4]    The agreement also provided that ABC might owe approximately $51,000 more.

- 3 -

had been entered into the accounting and banking system, "the only way they could make up the problems to ABC was by shipping future goods on more favorable terms until the offsets were taken care of". According to Lian, MMB representatives stated that the signed payment agreement was necessary only to appease the bank and the controller, which would allow MMB to continue shipments to ABC on agreed-upon terms; that MMB representatives told him that the oral agreements, *i.e.* replacement of goods and future shipments on D/A 90 terms, could not be reduced to writing for "political reasons" -- that "some people could go to jail over this situation"; and that he "would not have signed the Agreement had he known that MMB did not have the intention or the ability to perform their part of the bargain". Lian estimated that the total amount of defective goods and shortages was $500,000.

On September 1, MMB sent a letter to Lian by fax, which stated, in part, that straight D/A 90 terms would not be permitted and arguably indicated that this issue had been part of the total agreement.[5] Lian replied twice. His first was that he could not

---

[5] The letter provided:

> After you left the Peace Hotel Beijing, I tried very hard to convince the Bank, Finance Division, and Auditing Division personnel to agree to the installment plan. They were not satisfied with *the result of our negotiations* for the following reasons: ... (3) the terms of future payments must be changed to sight L/C.
>
> I told them about: (1) the achievement we have made so far as a result of our cooperation in developing the market; (2) the future perspective of our business; and (3) the temporary difficulties that you are now facing. Afterwards, they approved

- 4 -

operate on a letter of credit basis.[6]  His second, in late

the installment payment plan on the past overdue amounts.  Furthermore, I told them that ... the pay condition of sight L/C in the future will not work in this practical situation.  After repeated discussion, they finally agreed to maintain the favorable condition of D/A 90 days, but must be under the condition of L/C, so that debt and delayed payments can be avoided in the future.

I have done my best and hope you will understand.... Based on my judgment, you have to accept this condition, otherwise we both will fall into an unresolvable pit.

(Emphasis added.)

[6]   The first reply stated in part:

I deeply regret hearing the decision made by the Finance and Audit Division of MMB.  They probably only looked at this problem from their own angle ....

Besides, due to the agitation created by other persons and other companies, we have not received any shipment from you.  Not only did you stop the source of supply to me, but also provided favorable D/A conditions directly to my clientele.  My loss is tremendous.
. . .

... Please understand L/C sight or L/C 90 days is no different from hard cash.  I have to spend hard cash to get the credit.  If your corporation can't fully cooperate with me whole-heartedly, our teamwork may collapse sadly.

. . .

At this time, I hope your corporation will once again judge this problem from both finance and business angles, both yours and my situation, and the battle that is happening on the market.  Then give me the favorable payment condition of D/A 90 days and resume the supply to me.  Only then, the temporary stoppage of our business can be ceased, all the needed capital can be gathered, the supply can be resumed, and the money that my customers owed me after a discount can be collected.

September, referenced the alleged oral agreement for D/A 90 terms and arguably also referenced the alleged oral agreement to provide replacement goods.[7]

Because ABC, in early September 1989, stopped payment on the check issued in Beijing, and informed MMB that it would not honor the payment schedule, MMB filed suit against ABC (and others not parties to this appeal) to recover payment on the agreement. The substantive claim, styled as on a "sworn account", was later described by MMB as an "account stated". The defendants answered, asserting various defenses to payment, including (1) fraudulent inducement of both the payment agreement and the check issued in Beijing; (2) duress; (3) breach of agreement and breach of contract; (4) breach of express and implied warranties; and (5)

---

[7]    The second reply provided in part:

> This company originally planned to increase capital, circulate cash flow, and smoothly resolve the difficult situation including making payments and discounting merchandise. However, what has occurred was not what I wished. Certain unfavorable happenings have taken place. I am reporting to you as follows:
>
> . . .
>
> 2) Since your corporation could not follow what has been proposed in Beijing and could not make timely shipments to me before Spt. 10, using D/A 90 days payment condition, this company has to spend extra cash of $300,000 to purchase goods from other sources. (cash flow period is 4 to 5 months)
>
> 3) Due to bad quality of merchandise, disagreement between documents and actual arrivals, and other major reasons, some of my customers have cancelled their orders, some made returns, and others delayed payments to us....

offset.  ABC also counterclaimed against MMB (and others not parties to this appeal) on several of the grounds asserted as defenses and for a Deceptive Trade Practices Act (DTPA) violation.

In January 1991, the district court stayed the action as to all parties except MMB and ABC until the basic account claims were adjudicated.  MMB moved for summary judgment.  In January 1992, after a hearing, the district court granted the motion, and subsequently ruled that "[t]he cause of action based on the sworn account is severed from the main action" and that the "only issue remaining and not previously stayed, is the defendants' counterclaim for breach of the oral agreement for future business".  A final judgment for approximately $1.7 million was entered for MMB.

## II.

ABC contends that the summary judgment is precluded by genuine issues of material fact relating to its defenses and counterclaims. It goes without saying that we review a summary judgment *de novo*, *e.g.*, **Topalian v. Ehrman**, 954 F.2d 1125, 1131 (5th Cir. 1992), *cert. denied*, ___ U.S. ___, 113 S. Ct. 82 (1992); and it is appropriate if the summary judgment record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law".  Fed. R. Civ. P. 56(c); **Celotex Corp. v. Catrett**, 477 U.S. 317 (1986).  Affidavits must set forth facts "as would be admissible in evidence".  Fed. R. Civ. P. 56(e).  Therefore, "conclusory assertions cannot be used in

an affidavit on summary judgement". *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992). Finally, we draw all inferences favorable to the non-movant. *Reid v. State Farm Mut. Auto Ins. Co.*, 784 F.2d 577, 578 (5th Cir. 1986).

### A.

MMB sued to recover the amount stated in the payment agreement, asserting that it represents a binding contract in which MMB agreed to extend payment terms, and ABC agreed to pay its outstanding obligations. For summary judgment, MMB characterized the agreement as an "account stated", which is "an agreement between parties who have had previous transactions of a monetary character that all the items of the account representing such transactions, and the balance struck, are correct, together with a promise, express or implied, for the payment of such balance". *Eastern Dev. & Invest. Corp. v. City of San Antonio*, 557 S.W.2d 823, 824-25 (Tex. Civ. App.-San Antonio 1977, writ ref'd n.r.e.). An account stated establishes a *prima facie* case for obligation "without other proof of price, value, quantity, or specific items". *Id.* at 826.

ABC contested the account stated characterization, contending that the written agreement reflects only one portion of their three-part agreement to resolve all disputes regarding payment and the quantity and quality of the goods: part one (written) -- ABC to adhere to a payment schedule; part two (oral) -- MMB to ship replacement goods to make up for non-conforming goods and

shortages; and part three (oral) -- MMB to resume shipment of goods on D/A 90 terms as of September 10, 1989.

The district court held that the parol evidence rule prevented the two oral agreements being a defense to ABC's obligations under the written payment agreement. It concluded that the written agreement is an unambiguous "account restatement", and that nothing in its four corners, or in the surrounding circumstances, indicates the existence of collateral contingent agreements. The court focused on the fact that the payment agreement did not refer to supply, and contained meaningful consideration (extended payment time); that, at the time of the summary judgment hearing (three years later), ABC was unable to quantify with specificity MMB's obligation to ship replacement goods; that MMB's letter denying D/A 90 terms did not refer to the payment agreement; and that Lian's subsequent letters did not characterize ABC's obligation under the payment agreement as contingent.[8]

---

[8] We gleaned the foregoing findings from the district court's colloquy with counsel during the summary judgment hearing; it did not make findings of fact and conclusions of law. Although, pursuant to Fed. R. Civ. P. 52(a), they "are unnecessary on decisions of [summary judgment] motions", and our review of the summary judgment record is *de novo*, we have often emphasized that findings of fact and conclusions of law are "permissible and often quite helpful for appellate review". *Boazman v. Economics Lab., Inc.*, 537 F.2d 210, 213 n.5 (5th Cir. 1976); *see also Wildbur v. Arco Chem. Co.*, 974 F.2d 631, 644 (5th Cir. 1992) (stating that a district court must "explain its reasons for granting a motion for summary judgment in sufficient detail for us to determine whether the court correctly applied the appropriate legal test"); *Williamson v. Tucker*, 645 F.2d 404, 411 (5th Cir.), *cert. denied*, 454 U.S. 897 (1981) (noting that "an explanation of the basis of the district court's decision can be invaluable even in cases where Rule 52(a) clearly does not require findings of fact"). As we noted in *Chandler v. City of Dallas*, 958 F.2d 85, 89 (5th Cir. 1992) (bench trial), "the preparation of sufficiently complete

Under Texas law,[9] it is well settled that the parol evidence rule generally bars enforcement of prior or contemporaneous agreements introduced to vary, add to, or contradict terms of a fully integrated written instrument. *See, e.g.*, ***Tripp Village v. MBank Lincoln Centre***, 774 S.W.2d 746, 749 (Tex. App.–Dallas 1989, no writ). "[A] written instrument presumes that all prior agreements of the parties relating to the transaction have been merged into the written instrument", ***Weinacht v. Phillips Coal Co.***, 673 S.W.2d 677, 679 (Tex. App.–Dallas 1984, no writ); in other words, written agreements are presumed to be completely integrated. ***Jack H. Brown & Co. v. Toys "R" Us, Inc.***, 906 F.2d 169, 173 (5th Cir. 1990) (citing ***Hubacek v. Ennis State Bank***, 317 S.W.2d 30 (Tex. 1958)).[10] As discussed below, although ABC may rebut this

_____

conclusions of law augments our comprehension of the legal issues on appeal". This is no less applicable where, as here, Rule 52(a) does not require the court to make legal conclusions. Accordingly, when a summary judgment is granted, we urge the district court to provide findings of fact and conclusions of law.

[9]    We apply Texas law in this diversity action. ***Salve Regina College v. Russell***, ___ U.S. ___, 111 S. Ct. 1217 (1991). In its complaint, and thereafter, MMB relied on Texas law. ABC maintains, instead, that MMB's claim is governed by the United Nations Convention on Contracts for the International Sale of Goods (Sale of Goods Convention), *codified at* 15 U.S.C. Appendix (West Supp. 1993). MMB insists that Texas law controls. As noted in ***Filanto S.p.A. v. Chilewich International Corp.***, 789 F. Supp. 1229, 1237 (S.D.N.Y. 1992), *appeal dismissed*, 984 F.2d 58 (2d Cir. 1993), "there is as yet virtually no U.S. case law interpreting the Sale of Goods Convention". We need not resolve this choice of law issue, because our discussion is limited to application of the parol evidence rule (which applies regardless), duress, and fraudulent inducement; however, the district court may need to do so on remand.

[10]    ABC urges that we apply the parol evidence rule applicable to the sale of goods, which, unlike the common law, does not presume that an apparently complete writing is a total integration. *See*

- 10 -

presumption, *id.* at 174, it failed to do so.  *See* *id.* (court determines whether written instrument is complete).

1.

In support of its contention that the payment agreement is incomplete, ABC notes evidence that it had previously complained about the quality of goods; that it travelled to Beijing to sign the payment agreement; that in discovery, MMB representatives admitted that, during the August 1989 meetings in Beijing, Lian discussed the issues of non-conforming and defective goods in past shipments (albeit for a minimal amount of time and not with specificity); and that the earlier referenced fax sent by MMB shortly thereafter referred to ABC's request for D/A 90 terms in the context of their negotiations in Beijing.

Although this evidence leads us to question why ABC signed the payment agreement, we cannot say that it is incomplete.  Underneath the heading (as translated by ABC), "Agreement on installment payments of overdue merchandise amount",[11] the parties itemized the

---

Tex. Bus. & Com. Code Ann. § 2.202 comment 1 ("This section definitely rejects: (a) Any assumption that because a writing has been worked out which is final on some matters, it is to be taken as including all the matters agreed upon"); **Bob Robertson, Inc. v. Webster**, 679 S.W.2d 683, 688 (Tex. App.-Houston 1984, no writ). Because the agreement, on its face, is limited to a payment schedule for overdue invoices, and more closely resembles a settlement agreement, as opposed to a sale of goods, we will apply the parol evidence rule developed by Texas common law. *Cf.*, **Jack H. Brown & Co.**, 906 F.2d at 170-173 (applying common law rule to interpretation of settlement agreement concerning recovery of damages for breach of contracts to purchase signs and mansards).

[11]    The parties disagree over the translation of the payment agreement.  MMB contends that the heading should read, in part, "AGREEMENT ON *SETTLING* PAYMENT OVERDUE".  (Emphasis added.)

payment schedule, listing amounts due, invoice numbers, and revised payment dates. And, the agreement in no way intimates the existence of contingent extrinsic agreements regarding future shipments of goods. Instead, it specifies that "[b]oth sides participated in the negotiation, in a friendly manner, on the *problem of the amount overdue by the American Business Center, Inc.* to the Beijing Metals and Minerals Import and Export Corporation. *A unanimous agreement has been reached*". (Emphasis added.) Even accepting ABC's translation of the agreement, ABC's proof is not sufficiently persuasive to convince us to ignore the clear language of the written agreement. *Compare **Jack H. Brown Inc.***, 906 F.2d at 174 (agreement incomplete where parties admittedly made two agreements not mentioned and where agreement was facially incomplete). As this court recently stated:

> Both the parol evidence rule and the doctrine of integration exist so that parties may rely on the enforcement of agreements that have been reduced to writing. If it were not for these established principles, even the most carefully considered written documents could be destroyed by "proof" of other agreements not included in the writing.

*Id.* at 176.

2.

In addition, the two alleged oral agreements are not "collateral" to the written agreement. Evidence of a collateral contemporaneous agreement "though it refer to the same subject matter, and may affect the rights of the parties under the written contract" may be proven if not *inconsistent* with the integrated contract. ***Conner v. May***, 444 S.W.2d 948, 952 (Tex. Civ. App.-

- 12 -

Austin 1969, writ ref'd n.r.e.).  To be collateral, the agreement must be made for separate consideration, or "must be such as the parties might naturally make separately and would not ordinarily be expected to embody in the writing; and it must not be so clearly connected with the principal transaction as to be part and parcel thereof".  *Weinacht*, 673 S.W.2d at 680.  We examine the two claimed oral agreements in turn.

First, ABC asserts that MMB conceded that ABC is entitled to an offset of roughly $400,000 for defective and non-conforming goods, and thus agreed to ship replacement goods.  But, this extrinsic evidence contradicts the payment agreement, which states that "[t]he total amount which the American Business Center, Inc. owed to the Beijing Metals and Minerals Import and Export Corporation as a result of the D/A 90 day conditions, was U.S. $1,225,997.78", and is therefore inadmissible.  *See Rincones v. Windberg*, 705 S.W.2d 846, 849 (Tex. App.-Austin 1986, no writ) ("the parol evidence rule prohibits the admission of oral evidence which alters the payment terms of a written contract").

Second, ABC maintains that its obligation under the payment schedule was contingent upon MMB's agreement to resume shipment on D/A 90 day terms.  We agree with ABC that this alleged oral agreement, standing alone, is not inconsistent with the payment terms stated in the written agreement, because it is silent as to future sales.  However, evidence of the oral agreement is nonetheless inadmissible, because its contingent nature is inconsistent with the unconditional language of the written

- 13 -

agreement. *Cf.* **Jack H. Brown & Co.**, 906 F.2d at 176 ("[w]here a written release is unambiguous, any attempt to prove that the release was signed in return for additional consideration not mentioned in the release violates the parol evidence rule").

Moreover, we cannot conclude that a contingency of this nature would naturally be made as a separate agreement. As our court stated, when presented with a quite similar factual context in **Jack H. Brown & Co.**, 906 F.2d at 176:

> It is implausible that Toys would have used explicit, unconditional release language in Markham's letter, while orally agreeing to make the release contingent on some vague guarantee of future business. Nor can we believe that the alleged oral agreement is one that would be made separately .... This court recognizes that even the most sophisticated businessmen often deal with each other informally and verbally, but in circumstances such as these, even an unsophisticated businessman ... would either have protested the unconditional release language or insisted on getting the alleged oral agreement in writing.

Accordingly, we conclude, as did the district court, that ABC is barred by the parol evidence rule from introducing extrinsic evidence to alter the terms of the written agreement.[12]

B.

ABC asserts economic duress as a defense to its obligations under the payment agreement, contending that MMB used political unrest in China to convince Lian to sign it;[13] and that MMB refused

---

[12] Because the parol evidence rule bars evidence of both alleged oral agreements, we need not address the statute of frauds issue.

[13] In its answer, it pleaded only physical duress. Then, in opposition to summary judgment, it asserted, for the first time, economic duress (and criticized MMB for not addressing it in its motion). At the summary judgment hearing, the court concluded that

- 14 -

to reconcile the defective and non-conforming goods unless Lian signed, thus leaving him with no choice but to do so or lose a substantial amount of money.

Texas law is well-settled that there can be no duress unless: "(1) there is a threat to do something which a party threatening has no legal right to do; (2) there is some illegal exaction or some fraud or deception; and (3) the restraint is imminent and such as to destroy free agency without present means of protection". *Deer Creek Ltd. v. North Am. Mortgage Co.*, 792 S.W.2d 198, 203 (Tex. App.-Dallas 1990, no writ). Additionally, the opposing party must be responsible for the financial distress. *Id.*

We conclude that ABC failed to establish a material fact issue on every element of the defense. Specifically, it failed to provide probative evidence indicating it lacked a reasonable alternative to signing the agreement. According to ABC, if Lian did not sign, it would be forced to accept defective and non-conforming goods, driving it into financial ruin. In so stating, it wholly ignores the availability of pursuing its remedies under Tex. Bus. & Com. Code Ann., §§ 2.711 - 2.717, or, if applicable, the Sale of Goods Convention (articles 46-52). Aside from a general reference to "cash flow problems", and a reference to the difficulty and expense of cover, there is no evidence in the summary judgment record to indicate that ABC could not pursue its legal remedies. The above conclusory statements are insufficient to establish a material fact issue.

---

there was neither. On appeal, ABC raises only economic duress.

Therefore, we conclude that ABC failed to establish economic duress.  *See* **Palmer Barge Line, Inc. v. Southern Petroleum Trading Co.**, 776 F.2d 502, 505 (5th Cir. 1985) ("the failure or refusal to pay a contractual debt, without more, is insufficient to establish economic duress"); **Hurt v. Standard Oil Co.**, 444 S.W.2d 342, 347 (Tex. Civ. App.-El Paso 1969, no writ) (no duress where employee could have instituted suit rather than accept listed early retirement benefits).

C.

ABC asserts that the payment agreement is not enforceable because it was fraudulently induced by MMB's materially false representations that it would ship merchandise on D/A 90 terms and ship replacement goods.  Of course, parol evidence is admissible to prove fraudulent inducement.  *See* **Zoeller v. Howard Gardiner, Inc.**, 585 S.W.2d 920, 922-923 (Tex. Civ. App.-Amarillo 1979, writ ref'd n.r.e.) (internal quotation omitted) ("When the issue of fraud is raised .... [a]ll facts and circumstances leading up to and connected with the transaction are, ordinarily, admissible").

The elements for actionable fraud under Texas law are: (1) a material representation was made; (2) it was false when made; (3) the speaker knew it was false, or made it recklessly without knowledge of its truth and as a positive assertion; (4) the speaker made it with the intent that it should be acted upon; and (5) the party acted in reliance and suffered injury as a result.  **Cocke v. Meridian Sav. Ass'n.**, 778 S.W.2d 516, 520 (Tex. App.-Corpus Christi 1989, no writ).  Of critical importance here is that a promise to

do an act in the future is not fraud, unless it is made with the intent not to perform. *M.J. Sheridan & Sons Co. v. Seminole Pipeline Co.*, 731 S.W.2d 620, 624 (Tex. App.-Houston 1987, no writ).

ABC contends that Lian's affidavit and MMB's actions immediately following consummation of the agreement create material fact issues on all the elements for fraudulent inducement. We agree. Lian's affidavit, with all reasonable inferences in his favor, establishes that MMB representatives promised that it would ship replacement goods to make up for defective and non-conforming goods and would promptly begin shipping merchandise on D/A 90 terms; that these representations were false; that MMB made them with the intent that they would be acted upon; and that they induced Lian to sign the agreement to his detriment. The difficult question is whether the summary judgment record reflects material fact issues on whether MMB made representations with the intent not to perform, and whether ABC justifiably relied on MMB's representations. We examine these issues in turn.

1.

Intent not to perform a promise at the time it was made may be shown by circumstantial evidence, including the subsequent conduct of the promisor. *Pulchny v. Pulchny*, 555 S.W.2d 543, 545 (Tex. Civ. App.-Corpus Christi 1977, no writ). Needless to say, "[i]ntent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony" *Spoljaric v.*

*Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986); thus, "[s]ummary judgment is rarely proper". *Taylor v. Bonilla*, 801 S.W.2d 553, 557 (Tex. App. 1990, writ denied). Although the failure to perform, standing alone, does not establish the issue of fraudulent intent, "[s]light circumstantial evidence of fraud, when considered with the breach of promise to perform, is sufficient to support a finding of fraudulent intent". *Spoljaric*, 708 F.2d at 435 (internal quotations omitted).

The summary judgment record contains admissible evidence, which, with all reasonable inferences in ABC's favor, establishes that ABC had objected to the goods as defective and non-conforming; that Lian travelled to Beijing to meet with MMB representatives; that MMB agreed to resume shipments on D/A 90 terms and replace defective and non-conforming goods, but stated they could not put the agreements in writing because "some people could go to jail"; that, as a result, Lian, signed the payment agreement; and that, almost immediately upon consummation of that written agreement, MMB repudiated its promise, stating that the bank refused to agree to D/A 90 terms without a letter of credit (which would require Lian to procure a commitment from his bank to pay a draft drawn by MMB).[14] We conclude that the above evidence, particularly MMB's refusal to put the agreements in writing, followed almost immediately by its repudiation of one of them, creates a material fact issue on MMB's intent to perform.

---

[14] Needless to say, sellers prefer a letter of credit over D/A terms, in part, because banks generally are far more solvent than buyers.

- 18 -

In addition, we conclude that a material fact issue exists regarding Lian's justifiable reliance. In order to establish fraud, ABC must show that its reliance on MMB's representations was justifiable as well as actual. *Haralson v. E.F. Hutton Group, Inc.*, 919 F.2d 1014, 1025 (5th Cir. 1990) (applying Texas law), *modified on other grounds*, 1991 U.S. App. LEXIS 1029 (Jan. 25, 1991). "`Justifiable reliance' represents a lesser burden on fraud plaintiffs than what `reasonable reliance' might imply". *Id.* (internal citations and quotations omitted). To determine "justifiable reliance", courts inquire whether, "given a fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud -- it is extremely unlikely that there is actual reliance on the plaintiff's part". *Id.* at 1026; *see General Motors Corp., Pontiac Motor Div. v. Courtesy Pontiac, Inc.*, 538 S.W.2d 3, 6 (Tex. Civ. App.-Tyler 1976, no writ) (quoted in *Haralson*, 919 F.2d at 1026) (internal quotation omitted) (plaintiff may not justifiably rely on "representations which any [person of normal intelligence, experience, and education] would recognize at once as preposterous ... or which are shown by facts within his observation to be so patently and obviously false that he must have closed his eyes to avoid discovery of the truth").

MMB maintains that the summary judgment record reflects that Lian's reliance was not justified because, in his deposition, he admitted that he knew that the MMB representatives had no authority

to bind MMB, and, that approval from both the Chinese bank and the MMB controller was a condition precedent to future shipments.[15] We

---

[15]    The testimony reads as follows:

> Q:    And so you knew that before there would be any agreement for shipping that [MMB representatives] Mr. Yong, Mr. Jiang or Mr. Li would have to go to the bank first?
>
> A:    In my best knowledge, yes, they told me that they would show this and they were [sic] act right away.
>
> [COUNSEL]:  Did you understand that? Could you repeat?
>
> Q:    But you did know that they would have to go to their superiors before any kind of new shipping terms could be arranged?
>
> A:    In my best knowledge is like this: They know better about the regulation they have there and doing like this way, everything going to be, you know, just go smoothly and can be active right away.
>
> Q:    But you mentioned earlier they said they would have to go to their superiors and also to the bank; is that right?
>
> A:    Whatever the merchandise coming out, the document need to go through the a bank and that's why they need to show the -- show bank something like, well like case is like this, you know, it's not a problem, so, you know, they can go through the paperwork again.
>
> Q:    But you knew the bank would have to give its approval first?
>
> [COUNSEL]:  Did you know that?
>
> Q:    In my best knowledge is they need to go talk to the bank and controller in the company, yes. That's my best knowledge.
>
> A:    And so in order to have a written document that would show the future shipping terms, you would have had to have gone to either the bank

disagree. The testimony is arguably consistent with Lian's affidavit, in which he stated that MMB representatives told him that the written payment agreement was needed "only for purposes of appeasing the bank and the controller", and that both would allow MMB to ship goods to ABC on the agreed terms. According to Lian, he "would not have signed the Agreement had he known that MMB did not have the intention or *the ability* to perform their part of the bargain" (emphasis added).

In addition, we disagree with MMB's contention that it was obvious that its representatives had authority to bind ABC as to the payment schedule, but not as to agreements on future sales. None of the prior written agreements regarding future business listed the bank or the controller as a party, or specified that the terms were subject to approval. Moreover, the actual authority of MMB representatives was peculiarly within their knowledge. *Cf.* ***Trenholm v. Ratcliff***, 646 S.W.2d 927, 930 (Tex. 1983) (pure expressions of opinion are actionable "where the speaker purports to have special knowledge of facts that will occur or exist in the future").

In sum, because ABC established material fact issues on every element for fraudulent inducement, the district court erred in disposing of this issue by summary judgment.

---

or the controller, to your understanding?

    A:    In my understanding is like this:    This is their internal procedure.  Okay....

D.

ABC asserted defenses and counterclaims based on defective and non-conforming goods and short shipments, including breach of express and implied warranties, breach of MMB's and ABC's underlying contract, and violation of the DTPA. The court concluded that the payment agreement constituted a novation, precluding ABC's objections to the goods. Because there are material fact issues on the enforceability of that agreement, we conclude that ABC's defenses and counterclaims that pertain to the quality and quantity of goods received were prematurely dismissed. Simply put, if the payment agreement was fraudulently induced, it is not enforceable, and the parties are restored to their prior positions on the underlying contract(s), to include defenses to the amount owed on the outstanding invoices.

III.

For the foregoing reasons, the summary judgment as to fraudulent inducement and to claims or defenses pertaining to the quality and quantity of goods received is **REVERSED**; the judgment in all other respects is **AFFIRMED**; and this severed claim is **REMANDED** for further proceedings consistent with this opinion, to include, as to the payment agreement, extrinsic evidence not being admissible to alter its terms, but being admissible on whether it was fraudulently induced.

**AFFIRMED in Part, REVERSED in Part, and REMANDED**.