# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 18, 2011

No. 09-41046

Lyle W. Cayce
Clerk

HEI RESOURCES EAST OMG, Joint Venture,

　　　　　　　　　　Plaintiff-Appellee,

versus

S. LAVON EVANS, JR., OPERATING COMPANY, INCORPORATED;
S. LAVON EVANS, JR.; E&D SERVICES, INCORPORATED;
WAUSAU DEVELOPMENT CORPORATION,

　　　　　　　　　　Defendants-
　　　　　　　　　　Third-Party Plaintiffs-
　　　　　　　　　　Appellants,

versus

HEARTLAND ENERGY LAND OPERATING, L.P.;
HEARTLAND ENERGY OF COLORADO, L.L.C.;
HEI RESOURCES, INCORPORATED; REED CAGLE,

　　　　　　　　　　Third-Party Defendants-
　　　　　　　　　　Appellees,

Appeals from the United States District Court
for the Southern District of Texas
USDC No. 5:07-CV-62

No. 09-41046

Before JOLLY, HIGGINBOTHAM, and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]

This is a dispute between and among several oil and gas companies in which the plaintiff, a joint venture named HEI Resources East OMG ("East OMG"), alleges that the defendants defrauded it out of $2.7 million. The defendants assert that East OMG has suffered no damages because they obtained the $2.7 million from an entity other than the plaintiff—specifically, one of the third-party defendants, HEI Resources, Inc. ("HEI"). The district court granted summary judgment for East OMG on its claims for fraud, violation of the Texas Theft Liability Act, unjust enrichment, money had and received, and civil conspiracy. We reverse and remand the summary judgment on all claims.

I.

There were three groups of parties in the district court: (1) the plaintiff-appellee, East OMG; (2) the three defendants-third-party plaintiffs-appellants: the natural person S. Lavon Evans, Jr. ("Evans"), and two corporations: S. Lavon Evans, Jr., Operating Company, Inc. ("Evans Operating"), and E&D Services, Inc. ("E&D Services") (collectively "defendants"); and (3) the third-party defendants/third-party counter-claimants, who are not parties to this appeal, the most important of which are the natural person Reed Cagle ("Cagle") and the corporation HEI. This action arises from the business relationship between and among Evans and Cagle and the various companies they control. Because the district court granted summary judgment for the plaintiff, the facts are recited in the light most favorable to the defendants. *Matsushita Elec. Indus. Co. v. Zenith Ra-*

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 09-41046

*dio Corp.*, 475 U.S. 574, 587 (1986).

Cagle is the president and CEO of HEI, a corporation that acts as the managing venturer of various joint ventures formed to explore for and produce oil and gas. East OMG is one of the joint ventures that HEI managed. Initially, East OMG was formed to explore, produce from, and operate an oil-and-gas well in Cameron Parish, Louisiana. Cagle and HEI have been doing business with Evans and his two companies since at least 2000. E&D Services drilled wells, and Evans Operating operated wells, for HEI and the various joint ventures that it managed.

In March 2007, HEI was in financial trouble. Cagle and Evans had a meeting during which Cagle disclosed to Evans that HEI's liabilities exceeded its assets by more than $14 million. HEI owed a substantial portion of that debt to Evans Operating—as of April 2007, at least $4 million. During the meeting, Cagle told Evans that HEI was looking for an oil-and-gas prospect to invest in. Shortly thereafter, Evans learned that a company called Milagro Exploration was seeking participants for a natural-gas prospect in Colorado County, Texas, known as the K-2 Prospect. In early April 2007, Evans met with representatives from Milagro and negotiated a participation agreement ("PA") for himself, individually, for the K-2 Prospect. He also negotiated a drilling agreement with Milagro on behalf of E&D Services.

Evans told Cagle he was planning to participate in the K-2 Prospect, and Cagle asked Evans whether he would consider selling a portion of his interest in the prospect. On April 12, Evans Operating sent a prospectus on the K-2 Prospect to HEI. Cagle sent ballots to each of the members of East OMG, asking them whether to vote to reorganize East OMG's purpose from drilling in Cameron Parish, Louisiana, to drilling in Colorado County, Texas. The venturers voted to do so. Importantly, there is no evidence in the record that shows that Evans knew that Cagle had presented the K-2 Prospect to East OMG or that he knew

No. 09-41046

the members of East OMG had voted to change the venture's purpose.

On April 26, E&D Services issued an invoice to HEI for $2,781,250 for the K-2 Prospect. That same day, Evans told Cagle that the K-2 Prospect deal would not close unless HEI immediately made payment on the invoice. The next day, HEI wired $2,700,000 to a bank account belonging to Evans Operating at the International Bank of Commerce in Laredo, Texas.

On April 27, Milagro told Evans that it did not want to do the K-2 Prospect deal. The district court found—and the defendants do not challenge—that Milagro backed out because Evans had conditioned the PA on Milagro's using E&D Services as the drilling contractor for the Prospect. Milagro had been investigating E&D Services' available drilling rig and concluded that the rig was not suitable. The defendants have offered evidence that they did not know that Milagro was going to back out until approximately 12:30 or 1:00 p.m. on April 27.

Also on April 27, Evans called Cagle to tell him that the deal with Milagro had fallen through. According to Evans, Cagle did not demand return of the $2.7 million that Cagle had wired earlier that day; rather, Cagle asked Evans whether Evans knew of any other drilling opportunities in which he could invest.

On April 30, a representative of HEI called the Laredo bank and asked Laura Guerra, Evans Operating's local treasurer, to wire the $2.7 million back to HEI. Guerra began the wire-transfer process without consulting Evans. Later that day, when Evans spoke with Guerra and she told him about HEI's request, he ordered her to halt the transfer immediately.

What happened next was the subject of much dispute in the district court. According to Evans, HEI, on two occasions in November 2006, had transferred money out of accounts controlled by Evans Operating without Evans's consent. As a result, he was concerned that HEI would again try to take control of the funds in Evans Operating's account without his permission. So Evans made an all-night, twelve-hour drive from Jackson, Mississippi, to the bank in Laredo.

4

No. 09-41046

On the morning of May 1, he withdrew $2.5 million from Evans Operating's account in the form of four $500,000 cashiers checks and one $500,000 wire transfer. Evans drove the cashiers checks to a bank in Mississippi and used them to pay off outstanding invoices owed by HEI to Evans Operating.

East OMG filed this suit two weeks later, alleging numerous causes of action and seeking various forms of equitable relief. The defendants impleaded HEI, arguing that the $2.7 million belonged to HEI and that the defendants were entitled to keep the $2.7 million to set it off against HEI's substantial debts to the defendants.

The proceedings in the district court were extensive. East OMG eventually moved for partial summary judgment as to liability only. The court granted it in part, concluding that East OMG was entitled to judgment as a matter of law on its claims of fraud, violation of the Texas Theft Liability Act, unjust enrichment, money had and received, and civil conspiracy. The court later modified its judgment to include exemplary damages. The defendants appeal as to all five claims, arguing, *inter alia*, that the court did not apply the correct summary judgment standard.

II.

"We review [a] summary judgment *de novo*." *Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*, 2011 U.S. App. LEXIS 461, at *10 (5th Cir. Jan. 7, 2011) (citing *Croft v. Governor of Tex.*, 562 F.3d 735, 742 (5th Cir. 2009)). Summary judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The movant has the burden of showing that summary judgment is appropriate, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and we view the evidence in the light most favorable to the non-moving party, making all inferences in its favor, *Matsushita*,

5

No. 09-41046

475 U.S. at 587.

"Where, as here, the moving party bears the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991) (emphasis, citation, and internal quotation marks omitted). A district court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.* 530 U.S. 133, 150 (2000). Therefore, "summary judgment is rarely proper in fraud cases because the intent required to establish fraud is a factual question 'uniquely within the realm of the trier of fact because it so depends upon the credibility of witnesses.'" *Rimade Ltd. v. Hubbard Enters., Inc.*, 388 F.3d 138, 144 (5th Cir. 2004) (quoting *Beijing Metals & Minerals v. Am. Bus. Ctr.*, 993 F.2d 1178, 1185 (5th Cir. 1993)).

III.

A.

The district court awarded East OMG summary judgment for fraud. Under Texas law, a fraud claim has six elements:

> (1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.

*In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex. 2001). The court found that the defendants made two false representations to East OMG: First, Evans and Evans Operating represented that a PA was in place between the Evans Parties and Milagro. Second, Evans and Evans Operating said that HEI Re-

6

No. 09-41046

sources, as East OMG's managing venturer and agent, needed to wire the defendants $2.7 million by April 26, 2007, to close the deal. We refer to those two representations as, respectively, the PA representation and the wire-transfer representation.

The district court was correct to conclude that each of those representations satisfies the first two elements of fraud. As for the PA representation, it is undisputed that on April 12, Evans sent Cagle a prospectus about the K-2 Prospect in which Evans represented that he had a PA in place with Milagro. It is also undisputed that Milagro and Evans never entered into a PA.

As for the wire-transfer representation, Evans does not deny that he told HEI on April 26 that it needed to wire the $2.7 million. Nor does he dispute the district court's conclusion that that representation turned out to be false: The $2.7 million was not sufficient to close the deal, because Evans had conditioned the deal on Milagro's using his drilling rig, which Milagro ultimately refused. Therefore, the district court was correct to conclude that the wire-transfer representation satisfies the first two elements of fraud. The court erred, however, in holding that there were no genuine disputes of material fact as to the remaining four elements.

1.

a.

The defendants' evidence creates a genuine dispute as to whether Evans knew, at the time he claimed a PA was in place, that no PA would ever be executed. Evans swore in his affidavit that he had negotiated a participation agreement with Milagro. To corroborate that testimony, Evans submitted an unsigned copy of the PA. He also presented a copy of a letter sent by his comptroller, Ronald Taylor, to Tom Langford of Milagro on April 26, 2007, that stated in relevant part, "we are enclosing a signed copy of the participation agreement."

7

No. 09-41046

Taylor affirmed in his deposition that he was "sure" the PA had been signed. Evans made the PA representation on April 12, when he sent the prospectus about the K-2 Prospect to HEI. He believed that he had successfully negotiated a PA with Milagro that merely needed to be formalized and reduced to writing; he did not know that the PA representation was false at the time he made it.

The district court's conclusion that no PA was in place was reached without considering any of the above-described evidence. The court relied solely on its conclusion that Marshall Munsell, a Milagro vice-president, testified that there was no PA with the defendants for the K-2 Prospect. But Munsell's testimony does not establish that Evans was aware on April 12 that Milagro would ultimately decline to execute the PA. Nor did he claim that no PA was ever executed. Rather, he testified that he did not recall that Milagro ever received a PA executed by Evans. Munsell did state that he had searched Milagro's corporate files and had not found any executed PA with Evans for the K-2 prospect. The district court did not consider, however, a plausible alternate explanation as to why he was unable to locate a copy of a signed agreement: Munsell testified that Milagro regularly discarded executed copies of agreements where the transaction was never consummated.

It is undisputed that Milagro and Evans never consummated a transaction. Therefore, Milagro's lack of a signed PA in its files can support either of two inferences: that Evans never signed the PA or that Milagro destroyed the signed PA after the deal fell through. Because Evans was the non-moving party, the district court should have drawn the latter inference. And if a jury believed that Evans signed the PA and mailed it to Milagro, then it could also conclude that Evans believed on April 12 that he had successfully negotiated a PA with Milagro.

Therefore, it was error for the court to conclude that Evans did not know that the PA representation was false at the time he made it. Because there is

No. 09-41046

a genuine dispute of material fact, summary judgment for fraud based on that representation was improper.

b.

The district court did not discuss whether the wire-transfer representation satisfied the third element of fraud, and there is a genuine dispute as to whether Evans knew on April 26 that the wire-transfer representation was false. East OMG has not pointed to any evidence that establishes that Evans knew on April 26 that the K-2 Prospect deal with Milagro was not going to close. East OMG, as the party moving for summary judgment on a claim on which it bears the burden of proof, has the initial burden to establish all the essential elements of its claim. *See Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). Because it failed to meet that burden, summary judgment was improper. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).

The defendants have also offered evidence that, taken as true, affirmatively establishes that as of April 26, Evans did not know that the K-2 Prospect deal was dead. In his affidavit, he swears that, "[a]s late as 4:51 p.m. on April 26, 2007, I still intended to close the K-2 transaction as evidenced by the e-mail by Tom Langford of Milagro . . . . I had every intention of closing the deal."

The e-mail Evans references is time-stamped 4:51:23 EDT, April 26, 2007. In it, Langford says to Ron Taylor, Evans's comptroller, "I will make wire instructions part of closing documents once we have all your comme[nts on the] participation agreement and drilling agreements." If, as East OMG must establish, Milagro had already decided by April 26 that it would not go forward with the deal *and* had communicated that decision to Evans, it is unlikely that Milagro's representatives would have continued preparing to close the deal.

In addition, Taylor testified in deposition that Milagro did not call the defendants to tell them the deal was off until "[a]pproximately 12:30 [or] one

No. 09-41046

o'clock" on April 27. That evidence would allow a jury to conclude that Evans did not know, until mid-day April 27, that the deal with Milagro was not going through. Because there is a genuine dispute of material fact as to whether Evans was aware that the wire-transfer representation was false at the time that he made it, summary judgment on the fraud claim was improper.


2.

There is also insufficient evidence to support the district court's conclusion that East OMG proved that Evans intended for *East OMG* to rely on the participation-agreement representation and the wire-transfer representation. There is ample evidence—indeed, the defendants appear to concede—that Evans intended for HEI to rely on his representations. And there is some evidence that HEI was in fact acting on behalf of East OMG. But no evidence shows that Evans was aware of HEI's motivation and that he intended for East OMG to rely on his representations.

To establish fraudulent intent, East OMG must show that Evans had "reason to expect" that East OMG would act in reliance on his misrepresentation. *See Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577-80 (Tex. 2001). It is not enough that Evans should have known that East OMG would rely or that East OMG's reliance was reasonably foreseeable. *See id.* at 579-80. "Even an obvious risk that a misrepresentation might be repeated to a third party is not enough . . . ; rather, the alleged fraudfeasor must 'have information that would lead a reasonable man to conclude that there is *an especial likelihood* that it will reach those persons and *will influence their conduct.*'" *Id.* at 580 (quoting RESTATEMENT (SECOND) OF TORTS § 531 cmt. d (1977) (emphasis added)). Where there is no evidence that the defendant knew the plaintiff was interested in the transaction about which he made the misrepresentation, the defendant could not have intended to induce the plaintiff's reliance. *Id.* at 578.

10

No. 09-41046

There is a genuine dispute of material fact as to whether it was especially likely that Evans's PA representation and wire-transfer representation would reach East OMG and influence its conduct. Cagle swears by affidavit that "HEI informed Evans . . . in early 2007 that HEI was looking for an oil and gas deal in which to invest." Notably, Cagle does not say that HEI informed Evans that HEI was looking for a deal in which to invest on behalf of East OMG. In his affidavit, Evans states that he knew that HEI was looking for projects to invest in on behalf of the numerous joint ventures it managed. And according to Evans, Cagle told him that the East OMG joint venture was for a Cameron Parish, Louisiana, well and not the K-2 Prospect or any well associated with Texas.

The district court concluded that Evans told HEI about the K-2 Prospect "to induce HEI Resources, as East OMG's agent, to pay the $2.7 million investment amount." That conclusion, however, was based on the court's erroneous determination that the defendants admitted that HEI Resources had acted on behalf of East OMG for the K2 Prospect. The court cited portions of Evans's affidavit, but they do not establish that Evans knew HEI was acting on behalf of East OMG. In fact, that evidence establishes the contrary conclusion. As of March 2007, the only information that Evans had about East OMG was that it was a joint venture whose sole purpose was to seek oil-and-gas prospects in southwest Louisiana; the K-2 Prospect is in Texas. Based on that information, Evans had no reason to expect that whatever information he gave HEI about the K-2 Prospect would even reach East OMG, much less influence its conduct.

Even if HEI was acting as East OMG's agent for the K-2 Prospect, no evidence shows that Evans was aware of that fact, and some evidence shows he believed otherwise. Therefore, there is a genuine dispute of material fact as to whether Evans intended to induce East OMG to rely on his representations, and summary judgment was improper.

11

No. 09-41046

3.

There are genuine disputes regarding the fifth and sixth elements of fraud: whether East OMG acted in reliance on Evans's alleged misrepresentations and suffered damages as a result. Specifically, East OMG has not offered evidence that shows that the $2.7 million HEI wired to the defendants belonged to East OMG or that HEI was acting on East OMG's behalf when it wired that sum to the defendants. Once again, East OMG has not carried its initial burden, and the defendants have introduced evidence that affirmatively creates a factual dispute.

East OMG's evidence establishes that (1) it is a joint venture; (2) its members voted in April 2007 to change its purpose from prospecting in Cameron Parish, Louisiana, to prospecting in Colorado County, Texas; (3) HEI is the managing venturer of East OMG; and (4) under the terms of the Joint Venture Agreement, East OMG was supposed to pay money to HEI pursuant to a turnkey contract. None of this evidence establishes that on April 27, HEI acted in its capacity as East OMG's managing venturer and sent $2.7 million on behalf of East OMG to the defendants for the purpose of investing in the K-2 Prospect.

Cagle's affidavit does not establish that proposition either. Cagle did not assert that the $2.7 million belonged to East OMG or that HEI was acting in its capacity as East OMG's managing venturer when it made the transfer. The absence of evidence establishing that East OMG had title to, or some kind of interest in, the $2.7 million defeats its proof as to the fifth and sixth elements of its fraud claim.

In addition, the defendants have designated evidence that affirmatively creates a dispute as to whether HEI was acting on behalf of East OMG when it wired the $2.7 million. HEI prepared a Confidential Information Memorandum describing the proposed purpose and operation of East OMG, which it distributed to potential investors. In describing how East OMG would operate, the mem-

orandum stated, "When the Venture commences Operations, the Venture will enter into a Turnkey Drilling Contract with HEI, pursuant to which HEI will, among other things, pay for the Venture's share of the costs to drill and test the Prospect Well."

As the defendants point out, there is no evidence that HEI and East OMG ever entered into a turnkey drilling contract. If that contract was a prerequisite to HEI's acting as East OMG's managing venturer, then HEI could not have been acting on behalf of East OMG when it wired the $2.7 million to the defendants. And if HEI was not acting on behalf of East OMG when it wired the $2.7 million, then East OMG did not act in reliance on Evans's misrepresentations or suffer damages as a result. It was error for the district court to find that East OMG had satisfied the fifth and sixth elements of its fraud claim, so summary judgment for fraud was improper.

## B.

The summary judgment for East OMG on its claims of violation of the Texas Theft Liability Act, unjust enrichment, money had and received, and civil conspiracy was predicated on the conclusion that the defendants had committed fraud. Because we reverse summary judgment on the fraud claim, we do the same on the other four claims.

In summary, we reverse the summary judgment on all of East OMG's claims. We therefore need not address the defendants' other arguments on appeal, including whether the district court erred in modifying the judgment to include exemplary damages. The summary judgment is REVERSED AND REMANDED for further proceedings as the district court may deem appropriate. We express no view on what decisions the court should make on remand, and we place no limitation on what matters it may consider.