UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 01-20764

_____


IQ PRODUCTS COMPANY,

                              Plaintiff-Intervenor
                              Defendant-Counter
                              Claimant-Appellant,


                    v.


     PENNZOIL PRODUCTS COMPANY,

                              Intervenor Plaintiff-
                              Counter Defendant-
                              Appellee,


                    v.


     PANDORA MANUFACTURING INCORPORATED,
       also known as Snap Products, Incorporated,

                              Defendant-Appellee.


_____

        Appeal from the United States District Court
           For the Southern District of Texas

_____
                September 23, 2002



Before DAVIS, DeMOSS, and STEWART, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

     Plaintiff IQ Products Co. brought suit against defendants

Pandora Manufacturing, Inc. (formerly known as Snap Products,

Inc.) and Pennzoil Products Co., alleging that defendants falsely

advertised their competing tire inflator product, Fix-A-Flat, in violation of the Lanham Act. The district court granted summary judgment in favor of defendants. For the reasons given below, we affirm.

## I.

This case involves competing tire inflator products. Plaintiff IQ Products Co. ("IQ") manufactures tire inflators under the brand names Repair Safe, AirUp, and Primis. Defendant Pandora Manufacturing, Inc. (formerly known as Snap Products, Inc.) and later defendant Pennzoil Products Co. ("Pennzoil") manufactures a competing tire inflator called Fix-A-Flat.[1] IQ alleges that from early 1994 to February 18, 1999, the defendants failed to label the product as "flammable" and falsely advertised Fix-A-Flat as "non-explosive" in violation of the Lanham Act. Accordingly, IQ argues that it is entitled to lost profits, disgorgement of defendants' ill-gotten profits, and attorneys' fees.

A tire inflator is a can of chemicals under pressure that a motorist uses to repair a leak in an automobile tire until a more permanent repair or replacement can be made. A motorist uses a tire inflator to inject pressurized gas into a tire to inflate it and also to patch the leak with a liquid sealant. Tire inflators

---

[1] The parties sell these tire inflators to retailers, not directly to consumers.

may be dangerous if their formula is flammable or explosive because repairmen making permanent repairs to damaged tires use metal tools and occasionally weld wheel rims while working on damaged tires. These activities may create sparks, which can cause a fire or explosion.

Snap Products began manufacturing and marketing Fix-A-Flat in 1990. In early 1994, Snap introduced a new formula of Fix-A-Flat, which is at issue in this lawsuit. IQ contends that this generation of Fix-A-Flat was both flammable and explosive. On November 4, 1997, Snap sold Fix-A-Flat and its "Snap" trade name to Pennzoil.[2] Pennzoil continued to sell Snap's 1994 formula of Fix-A-Flat until January 1998, when Pennzoil slightly modified the formula. Both parties agree that this slight change did not significantly alter the flammability or explosiveness of the product for purposes of this lawsuit. Pennzoil continued to sell this slightly modified version of Fix-A-Flat until February 18, 1999, when it recalled the product and began selling a new formula of Fix-A-Flat.

IQ argues that from early 1994 to February 18, 1999, the Fix-A-Flat formula was flammable and explosive.[3] Nevertheless,

---

[2]     Snap changed its name to Pandora on February 1, 1998.

[3]     Because of a release executed between IQ and Pandora in a prior suit, IQ's claims are limited to the period of March 25, 1997 through February 18, 1999. IQ does not contend that the formulation of Fix-A-Flat that Pennzoil began marketing after February 18, 1999 is falsely labeled or advertised.

IQ alleges that the defendants failed to label Fix-A-Flat properly as "flammable" or "extremely flammable" as required by federal law. IQ also maintains that the defendants falsely advertised that Fix-A-Flat was "non-explosive."

IQ brought suit against Snap in June 1998, alleging that the defendants' false advertising violated the Lanham Act. Pandora (Snap's new corporate name) filed an answer and counterclaim against IQ. In August 1998, Pennzoil intervened and filed a complaint against IQ. IQ then counterclaimed against Pennzoil.

The district court granted the defendants' motion for partial summary judgment on March 13, 2001. The district court concluded that (1) IQ's claims that the defendants falsely advertised Fix-A-Flat as non-flammable were limited to the defendants' alleged failure to label Fix-A-Flat properly as "flammable;" and (2) so construed, IQ's flammability claims did not survive summary judgment. On July 5, 2001, the district court granted final summary judgment for the defendants on the remaining issues. IQ now appeals.

## II.

IQ first argues that the district court erred by granting summary judgment for the defendants on IQ's claims that the defendants falsely advertised Fix-A-Flat as "non-flammable" in violation of the Lanham Act. We review the district court's

grant of summary judgment <u>de novo</u>.[4]

As an initial matter, we must resolve whether the district court properly limited IQ's claims to the defendants' failure to label Fix-A-Flat cans as "flammable." IQ maintains that its complaint should not be so narrowly construed, but should be read to allege that the defendants also affirmatively advertised Fix-A-Flat as "non-flammable."

The district court rejected this argument in its March 13, 2001 order granting partial summary judgment to the defendants and later clarified its holding in its July 5, 2001 order. The district court reasoned that:

> IQ never pled any claims related to flammability under the Lanham Act other than the failure to label the Fix-A-Flat can. IQ never amended its pleading to expand its claim to include other affirmative representations of non-flammability. Discovery has long been closed, trial is imminent, and the time has passed when such an amendment would not be severely prejudicial to Defendants.[5]

After reviewing the record, we agree. IQ's complaint nowhere alleges that the defendants affirmatively misrepresented Fix-A-Flat as "non-flammable." On the contrary, the complaint states, in relevant part, that:

> These misrepresentations have occurred because (i) Snap has not–as required by federal law–labeled its Fix-A-Flat as "Flammable," thereby falsely representing that Fix-A-Flat is "non-flammable" when, indeed, it is not; and (ii) Snap has falsely represented Fix-A-Flat as containing a "Non-

---

[4]    See <u>Blow v. City of San Antonio</u>, 236 F.3d 293, 296 (5th Cir. 2001).

[5]    R. at 1809-10.

Explosive Formula."[6]

Admitting that it never expressly alleged that the defendants affirmatively represented that Fix-A-Flat was "non-flammable," IQ urges this court to interpret the term "non-explosive," as used in the complaint, to include within its scope the term "non-flammable." This argument is unpersuasive. Throughout its complaint, IQ consistently treats its claims that the defendants failed to label Fix-A-Flat as "flammable" and that they affirmatively advertised the product as "non-explosive" as two distinct concepts. Moreover, while the two terms are related, they are not mutually exclusive; significantly, according to the ordinary understanding of the terms, material may be flammable--that is, tend to burn--while not being explosive.[7] Given the lack of any assertion in the complaint that the defendants made affirmative misrepresentations that Fix-A-Flat was "non-

---

[6]     R. at 4.

[7]     Webster's Third New International Dictionary defines "flammable" as "capable of being easily ignited and of burning with extreme rapidity." Webster's Third New International Dictionary 864 (1993). It defines "explosive" as "relating to, characterized or operated by, or suited to cause explosion." Id. at 802. "Explosion," in turn, is defined as "a violent expansion or bursting that is accompanied by noise and is caused by a sudden release of energy from a very rapid chemical reaction, from a nuclear reaction, or from an escape of gases or vapors under pressure." Id.
        In absence of technical expert testimony giving a specialized technical meaning of a term, we use its ordinary meaning. IQ offered no expert testimony tending to support the argument it now advances–i.e. that all flammable materials are explosive and vice versa.

flammable" and IQ's failure to amend its complaint in a timely fashion, we conclude that the district court correctly limited IQ's flammability claims to the defendant's alleged failure to label the Fix-A-Flat cans as "flammable."

IQ next argues that the district court improperly granted summary judgment for the defendants on its claims that the defendants failed to properly label Fix-A-Flat as "flammable" or "extremely flammable" as required by federal law.  IQ asserts that the omission of the word "flammable" from Fix-A-Flat's label misled consumers into believing that the product had passed the federally-mandated flame extension test required under 16 C.F.R. § 1500.3(c)(6)(vii).

The Lanham Act imposes liability on "[a]ny person who . . . uses in commerce any . . . false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities."[8]  As explained more fully below, the district court granted summary judgment for the defendants on IQ's failure to label claims primarily because it reasoned that IQ was attempting to use the Lanham Act to circumvent the Federal Hazardous Substances Act

---

[8]     15 U.S.C. § 1125(a)(1)(B) (2002).

("FHSA").[9]  A brief overview of federal regulation of hazardous substances is therefore appropriate.

The FHSA establishes a comprehensive scheme of product regulation and labeling.[10]  The Consumer Product Safety Commission ("CPSC") is responsible for enforcing the FHSA and promulgating, interpreting, and enforcing regulations under the FSHA.[11]  The CPSC has the discretion to exempt substances from the FHSA's full requirements[12] and to determine whether to prosecute FHSA violations.[13]  The FHSA does not authorize a private cause of action.

Since 1994, IQ has complained about Fix-A-Flat to the Federal Trade Commission ("FTC") and the CPSC.  The FTC referred IQ's complaint to the National Highway Traffic Safety Administration, which declined to take any regulatory action.  Likewise, the CPSC investigated and refused to take further action.

The district court granted partial summary judgment for the defendants on IQ's failure to label claims in its March 13, 2001 order.  The district court explained that by bringing a Lanham

---

[9]    15 U.S.C. §§ 1261-78 (2002).

[10]    Id.

[11]    Id.

[12]    15 U.S.C. § 1262.

[13]    16 C.F.R. § 1009.8.

-8-

Act claim against defendants for failing to properly label Fix-A-Flat, "IQ is impermissibly attempting to circumvent the FHSA by converting the Lanham Act into a vehicle to enforce the FHSA, which bars private actions, and to usurp the regulatory function of the CPSC here."[14] In reaching this conclusion, the district court relied on three cases, which we discuss below.

First, in <u>Mylan Laboratories, Inc. v. Matkari</u>,[15] the plaintiff drug manufacturer brought a Lanham Act claim against a competing drug manufacturer and its officers, alleging that the defendants' use of package inserts, brochures, and advertisements violated the Lanham Act because these materials falsely represented or implied that the drugs had been approved by the FDA. The Fourth Circuit affirmed the district court's dismissal of the case under Rule 12(b)(6).[16] The court explained that the plaintiff did not allege that the defendants affirmatively represented that the drugs were "FDA-approved."[17] The court further reasoned that:

> . . . [T]hat fatal deficiency cannot be cured by contentions that the very <u>act</u> of placing a drug on the market, with standard package inserts often used for FDA-approved drugs, somehow implies (falsely) that the drug had been "properly approved by the FDA." Such a theory is, quite simply, too great a stretch under the Lanham Act. We agree with the

---

[14]    R. at 1312.

[15]    7 F.3d 1130, 1137-39 (4th Cir. 1993)

[16]    <u>Id.</u>

[17]    <u>Id.</u> at 1139.

defendants that permitting Mylan to proceed on the theory that the defendants violated § 43(a) merely by placing their drugs on the market would, in effect, permit Mylan to use the Lanham Act as a vehicle by which to enforce the Food, Drug, and Cosmetic Act . . . .
   Mylan, in short, is not empowered to enforce independently the FDCA. . . .[18]

Similarly, in <u>Sandoz Pharmaceuticals Corp. v. Richardson-Vicks</u>,[19] the plaintiff, who manufactured children's cough syrup, alleged that its competitor violated the Lanham Act by mislabeling one of its ingredients as "inactive."  The Third Circuit affirmed the district court's denial of a preliminary injunction.[20]  The court stated that the FTC and the FDA heavily regulate drug labeling requirements.[21]  The court reasoned that "[n]either of these agencies' constituent statutes creates an express or implied private right of action and what the FD&C Act and the FTC Act do not create directly, the Lanham Act does not create indirectly, at least not in cases requiring original interpretation of these Acts or their accompanying regulations."[22]

Finally, in <u>Dial A Car, Inc. v. Transportation, Inc.</u>,[23] the

---

[18]   <u>Id.</u> (emphasis in original).

[19]   902 F.2d 222, 230-32 (3rd Cir. 1990).

[20]   <u>Id.</u>

[21]   <u>Id.</u> at 231.

[22]   <u>Id.</u> at 231 (internal citations omitted).

[23]   82 F.3d 484, 488-90 (D.C. Cir. 1996).

plaintiff limousine service brought suit against taxi cab companies, alleging that the companies misrepresented that they were allowed to provide corporate account transportation services outside their counties of licensure.  The D.C. Circuit affirmed the district court's dismissal of the plaintiff's claims under the Lanham Act.[24]  The court explained that this question was within the jurisdiction of the local Taxicab Commission.[25]  Citing Sandoz, the court explained that "[b]y entertaining appellant's claim, we would be transforming the Lanham Act into a handy device to reach and decide all sorts of local law questions."[26]

This case is analogous to the three cases discussed above, especially Mylan.  Like the Food, Drug and Cosmetic Act (at issue in Mylan and Sandoz), the FHSA does not create a private cause of action.  Rather, the FHSA vests the CPSC with the authority to enforce federal labeling requirements.  In this case, the CPSC was aware of Fix-A-Flat's alleged labeling deficiencies but took no action.  As a result, IQ essentially seeks to enforce the labeling requirements of the FHSA–an action which the CPSC, the enforcing agency, declined to do.  For these reasons, we conclude that the defendants' failure to label the product in keeping with

---

[24]  Id.

[25]  Id. at 488.

[26]  Id. at 490.

FHSA regulations, even if true, does not constitute a false or misleading statement that is actionable under the Lanham Act. Thus, we hold that the district court correctly granted summary judgment for the defendants on IQ's claims that the defendants failed to label its product as flammable.

III.

IQ next argues that the district court erred by granting summary judgment for the defendants on its claims that the defendants falsely advertised Fix-A-Flat as "non-explosive" when, in fact, they knew that this was not true. This court reviews the district court's grant of summary judgment <u>de novo</u>.[27]

As stated above, § 43(a) of the Lanham Act provides, in relevant part:

> Any person who . . . uses . . . any . . . false or misleading description of fact, or false or misleading representation of fact, which . . . misrepresents the nature, characteristics, [or] qualities . . . of his or her or another person's goods . . . shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.[28]

The plaintiff must establish five elements to make out a <u>prima facie</u> case of false advertising under the Lanham Act:

(1) A false or misleading statement of fact about a product;
(2) Such statement either deceived or had the capacity to deceive a substantial segment of potential consumers;
(3) The deception was material, in that it is likely to

---

[27] <u>See</u> <u>Blow v. City of San Antonio</u>, 236 F.3d 293, 296 (5th Cir. 2001).

[28] 15 U.S.C. § 1125(a).

-12-

influence the consumer's purchasing decision;
(4)    The product is in interstate commerce; and
(5)    The plaintiff has been or is likely to be injured as a result of the statement at issue.[29]

"The focus of the Lanham Act is on commercial interests [that] have been harmed by a competitor's false advertising."[30] To obtain money damages for false advertising under § 43(a) of the Lanham Act, the plaintiff must first demonstrate that the advertisement was (1) literally false; or (2) likely to mislead and confuse customers.[31]  If the statement at issue is shown to be literally false, the court must assume that it actually misled consumers, without requiring any evidence of such deception from the plaintiff.[32]  If the statement is shown to be misleading or ambiguous, however, the plaintiff must demonstrate actual deception through direct evidence of consumer reaction to the advertising or evidence of consumer surveys or consumer reaction tests.[33]

IQ alleges that the defendants made several false or misleading statements that falsely advertised Fix-A-Flat as "non-explosive."  First, IQ alleges that the defendants affirmatively

---

[29]    Pizza Hut, Inc.  v. Papa John's Int'l, Inc., 227 F.3d 489, 495 (5th Cir. 2000).

[30]    Procter & Gamble Co. v. Amway Corp., 242 F.3d 539, 563 (5th Cir. 2001) (internal quotation marks and citation omitted).

[31]    See Pizza Hut, 227 F.3d at 495.

[32]    Id. at 497.

[33]    Id.

-13-

misrepresented that the product was "non-explosive," a statement that IQ maintains was literally false.  In addition, IQ points out other statements that the defendants made that, while not literally false, were misleading and deceptive to consumers.[34]

The district court granted summary judgment for the defendants with respect to all of the contested statements.  The district court first found that the defendants' advertisement of Fix-A-Flat as "non-explosive" was not literally false, and therefore, actual deception and materiality could not be presumed.  The court then explained that the summary judgment evidence did not establish any actual deception or materiality as to any of the contested statements.

IQ argues that the district court erred in finding that the statement that Fix-A-Flat was "non-explosive" was not literally false.  IQ points to the testimony of its expert, Dr. John Jacobus to support its position.  Dr. Jacobus reported that he had tested Fix-A-Flat formula at issue and found that it was explosive under some circumstances.

Even if the district court erred in finding that IQ failed to present a genuine issue of material fact on the literal

---

[34]    Specifically, IQ alleges that the defendants made the following misleading statements:  "Do NOT use with other tire inflator products.  Other products may contain explosive gases which could cause injury to you or a tire repair professional;" and "DO NOT WELD ON A RIM WITHOUT FIRST REMOVING THE TIRE FROM THE RIM. FAILURE TO DO SO COULD CAUSE THE TIRE TO EXPLODE REGARDLESS OF WHETHER THE TIRE INFLATOR IS USED."

falsity of the defendants' statement that Fix-A-Flat was "non-explosive," which we do not decide, IQ failed to produce competent summary judgment evidence that it was harmed by the defendants' allegedly false and misleading advertisement. IQ presented no competent summary judgment evidence that indicates that consumers would have bought IQ's tire inflator products instead of Fix-A-Flat in the absence of the defendants' allegedly false and misleading statements.

IQ responds that the testimony of two of its expert witnesses, Dr. Al E. Birdwell and Yohanne Gupta, establish that IQ suffered actual harm. IQ contends that the district court improperly excluded the testimony of both witnesses under Federal Rule of Evidence 702. Dr. Birdwell gave opinions on the materiality of defendants' false statements (i.e.-the effect on the buying decisions of consumers) and the damage to IQ as a result. The magistrate judge excluded Dr. Birdwell's testimony under Rule 702 because it was based on "insufficient data" and "unreliable methodology."[35] The magistrate judge explained that Dr. Birdwell's opinions were based on the combined effect of the defendants' failure to label their product as flammable and the representation that Fix-A-Flat was "non-explosive."[36] The judge reasoned that the flammability issue was no longer in the case,

_____

[35] R. at 1565; see Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).

[36] R. at 1565.

and therefore, was irrelevant. The judge also found that Dr. Birdwell did not conduct any market or survey research or any data that could be subject to testing and verification.[37]

The district court also excluded testimony of Yohanne Gupta, IQ's CEO, essentially for the same reasons as Dr. Birdwell. The magistrate judge reasoned (and the district court subsequently adopted the reasoning) that Gupta had no reliable basis for his opinion that "consumers would have purchased [IQ's] products instead of Fix-A-Flat if Fix-A-Flat had been properly labeled."[38] Gupta offered no market research or tests to support his opinions. Instead, he based his opinion on "common sense."[39]

This court reviews rulings on the admissibility of expert evidence for abuse of discretion.[40] Based on our review of the record, we cannot say that the district court abused its discretion in excluding the testimony of Dr. Birdwell and Gupta. Neither expert conducted reliable survey or market research, commonly employed by market analysts, to support their conclusions that consumers would have purchased IQ's tire inflators were it not for the defendants' allegedly misleading

---

[37]   R. at 1564.

[38]   R. at 1563.

[39]   R. at 1563.

[40]   See St. Martin v. Mobil Exploration & Producing U.S. Inc., 224 F.3d 402, 405 (5th Cir. 2000).

statements about the explosiveness of the product.[41]
Furthermore, both witnesses' opinions describe the effect of the
combination of defendants' failure to label the product as
flammable and advertisement of it as non-explosive.  Neither
expert testified about what effect, if any, the defendants'
advertisement of Fix-A-Flat as "non-explosive" had on IQ
independent of the flammability issue.  It follows that the
experts' opinions were flawed because they based their
conclusions in part on the failure to label claims which the
district court correctly rejected.  For these reasons, we
conclude that the district court did not err in granting the
defendants' motion for summary judgment on IQ's claims that the
defendants falsely advertised Fix-A-Flat as "non-explosive."[42]

IV.

Finally, IQ contends that it is entitled to a new trial
because 28 U.S.C. § 455(b)(5)(iii) and 28 U.S.C. § 455(a)
mandated the district judge's disqualification.  Specifically, IQ
maintains that because Judge Harmon's father-in-law was a retired

---

[41]    See, for example, Pizza Hut, Inc.  v. Papa John's Int'l,
Inc., 227 F.3d 489, 497 (5th Cir. 2000) (explaining that "the
plaintiff may not rely on the judge or the jury to determine,
'based solely upon his or her intuitive reaction, whether the
advertisement is deceptive.'") (internal citation omitted).

[42]    IQ raises a number of other evidentiary objections to the
court's refusal to consider various summary judgment evidence.  We
have considered these objections and conclude that even if the
district court erred, it had no effect on the correctness of its
ruling.

partner of Baker Botts, the firm that represented Pennzoil, she was required to recuse herself.

Section 455(b)(5)(iii) provides that a United States judge "shall" disqualify himself when "[h]e or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person . . . is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding." In <u>Potashnick v. Port City Construction Co.</u>,[43] the district judge declined to disqualify himself from a case in which the lawyer for one of the parties was the law partner of the judge's father. This court held that the district judge should have recused himself under § 455(b)(5)(iii).[44] The court stated that "when a partner in a law firm is related to a judge within the third degree, that partner will always be 'known by the judge to have an interest that could be substantially affected by the outcome' of a proceeding involving the partner's law firm."[45]

In contrast, in <u>Weinberger v. Equifax, Inc.</u>,[46] this court held that the district judge need not recuse himself where his son was an associate in a law firm that represented one of the

---

[43]    609 F.2d 1101 (5th Cir. 1980).

[44]    <u>Id.</u> at 1113.

[45]    <u>Id.</u>

[46]    557 F.2d 456, 463 (5th Cir. 1977).

-18-

parties in the litigation.  The court explained that the son's "salary interest as an associate is too remote to fall under this 'financial interest' prohibition."[47]

In this case, Judge Harmon's father-in-law, Frank Harmon, was a retired partner of Baker Botts from the time the judge received the case in 1998 until Mr. Harmon's death on August 5, 1999.  Mr. Harmon received retirement benefits from Baker Botts until his death, at which point, Mr. Harmon's son (Judge Harmon's husband) received death benefits from the firm.  Both the retirement and death benefits were fixed sum amounts, with the exception that part of both formulae included a cost of living adjustment that included the lesser of (1) "the cost of living adjustment called for by the U.S. Department of Labor's U.S. Consumer Price Index in a given year" or (2) "the percentage increase in income of the fifth highest paid partner" at Baker Botts.

IQ argues that the component of the cost of living adjustment that takes into account the salary of the fifth highest paid partner is sufficient to require Judge Harmon's disqualification under § 455(b)(5)(iii).  This argument is not sound.  First, no matter how much money the fifth highest paid Baker Botts partner earns, the Consumer Price Index always functioned as a ceiling on the adjustment to which Frank was

---

[47]    Id.

entitled.  This is so because Frank or his son was only entitled to the _lesser_ increase of the two factors.  The interest of Judge Harmon's father-in-law and husband in Baker Botts' earnings is more remote than an associate's interest in the financial well-being of his firm.  An associate's continued employment or the amount of his bonus may depend on the financial success of the firm.  However, this is an insufficient financial interest to require disqualification under _Weinberger_.  It follows that Judge Harmon was not required to recuse herself under 28 U.S.C. § 455(b)(5)(iii).

Similarly, § 455(a) requires a federal judge to disqualify himself in any proceeding in which "his impartiality might be reasonably questioned."[48]  This test is objective.[49]  A judge should disqualify himself "if the reasonable man, were he to know all the circumstances, would harbor doubts about the judge's impartiality."[50]

Based on the above discussion, we are satisfied that the fact that Judge Harmon's father-in-law was a retired partner at Baker Botts is too remote to raise a reasonable doubt about her impartiality.  Therefore, Judge Harmon was not required to recuse herself in this case under either § 455(b)(5)(iii) or § 455(a),

---

[48]   28 U.S.C. § 4559(a).

[49]   _See_ _Potashnick_, 609 F.2d at 1111.

[50]   _Id._

and IQ is not entitled to a new trial.

V.

For the reasons given above, the judgment of the district court is AFFIRMED.

AFFIRMED.