IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 5, 2008

Charles R. Fulbruge III
Clerk

No. 06-50720

SCHLOTZSKY'S, LTD.

Plaintiff-Appellee

v.

STERLING PURCHASING AND NATIONAL DISTRIBUTION CO., INC.

Defendant-Appellant

Appeals from the United States District Court
for the Western District of Texas

Before BARKSDALE, DENNIS, and SOUTHWICK, Circuit Judges.

SOUTHWICK, Circuit Judge:

After a jury trial, the district court ruled in favor of a restaurant franchisor on claims brought against a food distributor under the Lanham Act. On appeal, the distributor alleges the Lanham Act was inapplicable, that an award of attorney fees and an injunction should be overturned, and that its counterclaims should be reinstated. We disagree and affirm.

FACTS

Schlotzsky's, Inc., the franchisor for a quick-serve restaurant system, filed for bankruptcy in 2004. Estate assets were sold at bankruptcy court auction. In January 2005, Schlotzsky's, Ltd. became the owner of the Schlotzsky's Deli restaurant system, trademarks, and associated rights. That company, which we

refer to as Schlotzsky's, is the plaintiff. When the predecessor and bankrupt company is referenced, we will call it "Schlotzsky's, Inc."

Some of the Schlotzsky's restaurant locations are company-owned while others are owned by franchisees. A franchise agreement governs the relationship between Schlotzsky's and each franchisee. Each agreement is not identical. However, all agreements give Schlotzsky's the right to establish quality standards, specify approved products, and designate manufacturers and distributors for products in which Schlotzsky's has a proprietary interest. Franchisees pay Schlotzsky's a percentage of restaurant sales as a royalty. Manufacturers pay license fees to Schlotzsky's for the right to use its trademark.

Some franchisees formed the Schlotzsky's Independent Franchisee Association (SIFA). SIFA advocated members' interests but did not own or operate any Schlotzsky's restaurants. SIFA did not have the power to bind any franchisee, contract on behalf of any franchisee, or act as the agent for any franchisee. The association is now inactive, as we will discuss.

In 2003 and 2004, Schlotzsky's, Inc. faced financial difficulties and a possible shortage of products. In March 2004, SIFA and Defendant Sterling Purchasing & National Distribution Co., Inc., agreed that Sterling would assess its ability to act as a supply chain manager for the Schlotzsky's system. In that role, Sterling would be the interface between the various franchise stores and suppliers to ensure that franchise locations received all necessary products. SIFA designated Sterling as an exclusive purchase and distribution representative, but had no authority to do so. In response to SIFA's request, Schlotzsky's, Inc. began unsuccessful negotiations with Sterling.

In June 2004, Schlotzsky's, Inc. replaced its senior management. In August 2004, the company filed for Chapter 11 bankruptcy. SIFA then introduced Sterling to the company's new management team. In a letter dated September 7, 2004, the bankrupt Schlotzsky's, Inc. approved Sterling as a non-

exclusive supply chain manager for its restaurant system, retaining the right to revoke this designation upon written notice to Sterling. Sterling continued to negotiate regarding its authority, but the non-exclusive nature of the relationship was not modified.

Franchisees began making alternative supply arrangements as the system's difficulties made some distributors reluctant to continue to supply financially strapped franchisees. SIFA thought Sterling could increase consistency in the product supply chain and that franchisees could avoid the indirect payment of license fees passed on to them from approved distributors. In October 2004, the bankrupt Schlotzsky's, Inc. and Sterling reached an impasse as to the non-exclusive nature of their relationship and negotiations were terminated. Despite the unsatisfactory terms of the agreement, Sterling continued to act as a non-exclusive distribution manager, and Schlotzsky's, Inc. continued to build relationships with other manufacturers and distributors.

Sterling began to hold itself out to manufacturers and distributors as the exclusive representative for purchasing and distribution of all goods and services within the Schlotzsky's system. Some specific evidence of this is discussed below. Sterling received rebates from manufacturers and distributors of Schlotzsky's branded and proprietary products. These rebates were passed on to the franchisees in the cost of supplies.

By January 2005, Schlotzsky 's, Ltd. (the plaintiff in this case) was the franchisor and the owner of the trademarks and other rights following the bankruptcy court sale. The new company's management began negotiating with potential new distributors. In March 2005, Schlotzsky's contracted with two primary distributors for their branded and proprietary products. Beginning June 30, 2005, SYGMA Network, Inc. would act as the primary distributor for states west of the Mississippi River and Commissary Operations, Inc. ("COI") would act as the primary distributor for states east of the Mississippi River.

With the new distributors in place, Schlotzsky's terminated Sterling as the non-exclusive supply chain manager, with June 30, 2005, being the effective date of termination. Franchisees were required to purchase at least ninety-five percent of products through either SYGMA or COI. These steps apparently convinced SIFA leaders that they no longer needed their association; SIFA voluntarily placed itself on inactive status. However, Schlotzsky's became increasingly troubled with Sterling's actions.

In March 2005, Schlotzsky's filed suit against Sterling in federal court in the Western District of Texas. In March 2006, a jury found that Sterling willfully committed false designation of affiliation, sponsorship, or approval with respect to Schlotzsky's commercial activities. The jury also found that Sterling wrongfully obtained $350,000 in profits. Sterling's antitrust and tortious interference counterclaims were dismissed under Federal Rule of Civil Procedure 50. The district court set aside the jury's damage award, finding it to be inequitable to award damages for loss of profits to Schlotzsky's because damages were not proved with the required specificity. Instead, the district court awarded extensive injunctive relief. Seventy-five percent of the requested attorney fees were awarded.

Sterling timely appealed the decisions of the district court. Schlotzsky's cross-appealed the district court's refusal to award disgorgement of profits and the district court's reduction of attorney fees. In a subsequent motion to dismiss its cross-appeal, Schlotzsky's maintained these issues were wrongly decided but concluded that it was unlikely under the applicable standard of review that this Court would disturb the district court's rulings. We granted the motion to dismiss the cross-appeal, leaving only Sterling's issues to be resolved.

DISCUSSION

Schlotzsky's brought suit against Sterling under the Lanham Act. 15 U.S.C. §§ 1051-1141. We find it useful to make a brief introduction to the Act before analyzing the specific issues before us:

> The present Trademark Act, the Lanham Act of 1946, took effect on July 5, 1947 and was intended to combine the previous Trademark Act and its numerous amendments scattered throughout the United States statutes, to eliminate confusion created by conflicting interpretations, to simplify and liberalize registration and make it more meaningful, to dispense with overly technical prohibitions, and to provide prompt and effective relief against infringement. In addition to the usual objectives of the protection of trademarks, i.e., securing to the owner the goodwill of his business and protecting the public against false and deceptively marked goods, the Act is aimed at broadening the trademark owner's rights.

4A CALLMANN ON UNFAIR COMP., TR. & MONO. § 26:1 (4th ed.). The Lanham Act codified and unified the common law on unfair competition and trademark protection, and through several amendments since its adoption in 1946, remains the principal statutory protection of trademarks. Inwood Lab., Inc. v. Ives Lab., Inc., 456 U.S. 844, 861 n.2 (1982) (White, J., concurring).

Sterling divides its Lanham Act challenges into three parts: (1) the Act is inapplicable; (2) even if the Act is applicable, there is no evidentiary support for either an injunction or attorney fees; and (3) issuing the injunction was error as a matter of law. Sterling also alleges that it was error to dismiss its claims under (4) state tort law, and (5) federal antitrust law. We will discuss the issues in that order.

I.    Applicability of the Lanham Act

Sterling argues that the Lanham Act relates only to trademarks, not to all commercial activities. It alleges that its actions did not involve a misuse of Schlotzsky's trademark and therefore did not violate the Lanham Act.

We first look at Sterling's actions, then decide whether those actions ran afoul of the Lanham Act. There is ample evidence that Sterling mischaracterized its relation with Schlotzsky's. For example, on September 14, 2004, shortly after Sterling became a non-exclusive supply chain manager, Sterling and Van Eerden Food Service signed an agreement wherein Sterling stated that it was a "purchasing agent appointed by both Schlotzsky's, Inc." and SIFA and was "appointed by Schlotzsky's, Inc. and [SIFA] to be their exclusive representative in the purchasing of products . . . ." There was evidence of seven contracts between Sterling and distributors containing the same misrepresentation that Sterling was the exclusive representative and purchasing agent within the Schlotzsky's system. There was also evidence of thirty-two contracts between Sterling and manufacturers wherein Sterling claimed to be the "exclusive representative for purchasing and distribution of all goods and services within the Schlotzsky's system." Sterling also misrepresented its authority to SYGMA. Schlotzsky's learned of some of these misrepresentations only during discovery after suit was filed.

In one instance, Sterling demanded that Colorado Gold, the only approved manufacturer of the Schlotzsky's brand of potato chips, pay rebate fees or risk being replaced by another manufacturer. Colorado Gold resisted, then paid some rebates, and finally stopped making these payments and sued Sterling.

Two weeks after Schlotzsky's notified Sterling that it would no longer be a non-exclusive supply chain manager, Sterling entered into a contract with PepsiCo Food Service, Inc. PepsiCo was a supplier of non-proprietary potato chips to the Schlotzsky's system before Sterling's involvement. This contract contained similar misrepresentations, namely, that Sterling was authorized to execute the agreement on behalf of Schlotzsky's system.

With these incidents as a fair survey of Sterling's actions, we turn to whether this type of conduct violates the Lanham Act. When we interpret the

scope of a statute, we are resolving a question of law. Woodfield v. Bowman, 193 F.3d 354, 358 (5th Cir. 1999).

The relevant language of Section 43(a) of the Lanham Act is this:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which–

> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)[1].

The Supreme Court recently addressed the meaning of Section 43(a). Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23 (2003). At issue in Dastar was whether a producer of a new video production violated Section 43(a) by not acknowledging reliance on an original television production. Id. at 25-28. Although the specific language of Section 43(a) at issue in Dastar was "origin of goods," the Court explained that Section 43(a) is "one of the few provisions that goes beyond trademark protection." Id. at 29. The language of Section 43(a) is broader than much of the Lanham Act in that it "prohibits

---

[1] The Act was modified with an effective date of October 5, 2006. However, the language relevant to this appeal quoted above remained unchanged.

actions like trademark infringement that deceive consumers and impair a producer's goodwill." Id. at 32. Though broad in scope, the Court cautioned that the Lanham Act "should not be stretched to cover matters that are typically of no consequence to purchasers." Id. at 33. The Court then rejected the plaintiffs' claim in Dastar, concluding that claims to protect an author's interest were actionable under copyright law, not the Lanham Act.

After Dastar, other courts have followed the Supreme Court's directive that Section 43(a) may be applied to situations in which a registered trademark is not involved. Zyla v. Wadsworth, Div. of Thomson Corp., 360 F.3d 243, 251 (1st Cir. 2004) (stating that the "existence of a trademark is not a necessary prerequisite to a § 43(a) action"); Empresa Cubana Del Tabaco v. Culbro Corp., 399 F.3d 462, 478 (2d Cir. 2005) (stating that Section 43(a) includes causes of action grounded in allegations of false or misleading description of fact and false or misleading representation of fact); Gnesys, Inc. v. Greene, 437 F.3d 482, 488-89 (6th Cir. 2005) (stating that Section 43(a) concerns false representation by those engaged in commerce, and is clearly not limited to trademark issues).

This Circuit has stated that "Section 43(a) of the Lanham Act has been characterized as a remedial statute that should be broadly construed." Seven-Up Co. v. Coca-Cola Co., 86 F.3d 1379, 1383 (5th Cir. 1996). It is true that the Court has found that the congressional purpose for the Lanham Act was to provide remedies for unfair and misleading use of trademarks. Proctor & Gamble, Co. v. Amway Corp., 242 F.3d 539, 563 (5th Cir. 2001). As already noted, though, Dastar directs that Section 43(a) extends beyond mere trademark protection.

Schlotzsky's claim is that Sterling damaged its goodwill and profited by misrepresenting that it was solely authorized to act on behalf of the franchisor in relevant respects. Sterling's action threatened the goodwill of the Schlotzsky's brand with suppliers, some of whom already had the authority to manufacture and distribute Schlotzsky's products. It caused confusion with franchisees

concerning the details of the association Sterling had with Schlotzsky's. As middleman between suppliers and franchisees, Sterling deceptively used the Schlotzsky's brand name in an effort to further Sterling's position in the marketplace. These actions violate the prohibition against representations of fact that are "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another . . . ." 15 U.S.C. § 1125(a)(1).

The reach of Section 43(a) of the Lanham Act is sufficient to encompass Sterling's deceptions.

## II. Sufficiency of Evidence

Even if Section 43(a) of the Lanham Act applies to the kinds of misrepresentations that were shown here, Sterling argues that the claim must fail because the district court did not allow the jury's monetary award to stand. After the jury found $350,000 in damages, the judge denied Schlotzsky's motion to enter judgment on that award, finding in the initial post-trial order that Schlotzsky's "did not prove . . . actual damage," and that Schlotzsky's had to some extent benefitted from some of Sterling's actions, even if wrongful. In a subsequent order, the trial court either changed its emphasis in describing or its view in finding damages. The new order stated that it was "beyond question" that Schlotzsky's suffered "significant damage" as a result of Sterling's actions. However, the court found that there was a failure of proof of the precise monetary amount of those damages.

Sterling would have us focus our analysis on the initial trial court finding that there was no proof of actual damage. There is no argument here that there was any untimeliness or other defect in the procedure by which the revised order was entered. Once properly amended, the new order will be the one measured by the applicable appellate review standard.

Our examination of the evidence does not reveal much of a means to place a dollar value on the effect of Sterling's actions. As the trial court noted, one of the complications in quantifying injury is that Sterling was actually providing a service that allowed franchisees and distributors of products to be linked. The extent to which the link led to higher prices and lower profits was not reduced to any evidentiary measure. These misrepresentations were occurring during a period of intense financial distress for the company and the franchises. The evidence of a wrong being committed is clear. The evidence of precise damage is not. Where that leaves the claim is our legal issue.

Sterling argues that failure to prove an amount of actual damages is fatal to Schlotzsky's suit. In the precedent on which Sterling relies, the plaintiff, a competitor of the defendant, brought suit for the defendant's allegedly false advertisement of its product. IQ Products Co. v. Pennzoil Products Co., 305 F.3d 368, 370 (5th Cir. 2002). A prima facie false advertisement claim under the Lanham Act requires proof of five elements: (1) false or misleading statement of fact about a product; (2) the statement deceived or had the capacity to deceive a substantial segment of potential consumers; (3) the deception was material; (4) the product is in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the statement at issue. Id. at 375. The plaintiff was not allowed to introduce expert testimony on its damages because of defects in the data and methodology used by the expert. Id. at 376. This Court affirmed summary judgment for the defendant because the plaintiff failed to demonstrate actual or likely future injury from the defendant's conduct. Id. at 375-76.

The present claim is not one for false advertisement under Section 43(a)(1)(B), as was Pennzoil. Schlotzsky's makes its claim for relief under subpart (A) of Section 43(a)(1). In at least one precedent interpreting Section 43(a)(1)(A), though, this Court held that these same five elements applied. King v. Ames, 179 F.3d 370, 373-74 (5th Cir. 1999). The plaintiff was the daughter of a

deceased musician who claimed that the defendant, though licensed to sell compact discs of her father's music, was falsely naming himself on the discs as the producer of the music. Id. at 372. The claim failed because there was no evidence that anyone was injured as a result of that possible misattribution. Id. at 375. But see Decorative Center of Houston, L.P. v. Direct Response Publ'ns, Inc., 208 F. Supp. 2d 719, 729 (S.D. Tex. 2002) (discussing contrary views from some courts, one of which rejects that proof of injury is necessary for injunctive relief under Section 43(a)(1)(A)).

Both subsections of Section 43(a) are followed by the phrase that an offender "shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such acts." 15 U.S.C. § 1125(a)(1). We accept that at least the likelihood of injury must be proven in this case even if only injunctive relief is to be ordered.

The Lanham Act's remedial provision is broad. A plaintiff is entitled, under the "principles of equity," to recover the profits a defendant gained from its violation of the Act, "any damages" the plaintiff suffered, and costs. 15 U.S.C. § 1117. The district court's determination of damages may be set aside only if it is clearly erroneous. Fed. R. Civ. P. 52(a).

This Circuit has previously held that the injury requirement under Section 43(a) can be satisfied even though a party fails to establish a specific amount of actual loss. Logan v. Burgers Ozark Country Cured Hams, Inc., 263 F.3d 447, 463 (5th Cir. 2001). The district court here in effect agreed with the conclusion reached in Logan, that "there was sufficient evidence from which the jury could have inferred [that the plaintiff] was in some way injured." Id. Sterling, though, argues that there was no evidence to support the trial court's finding, and indeed, that the court had admitted in its earlier order that Schlotzsky's had not proven any actual damage. What is needed is sufficient evidence that

Schlotzsky's had been or was likely to be injured as a result of the violation of the Act. King, 179 F.3d at 373-74.

The evidence consisted of Sterling's misstatements to scores of franchisees and distributors that Sterling was the exclusive representative for Schlotzsky's in making these contracts. An unavoidable inference is that the misrepresentation was done to maximize Sterling's bargaining power and therefore its income by substituting itself for other alternatives that might have been available to distributors and franchisees. A dollar value on the extent to which this plan succeeded – maximizing Sterling's income at the expense of others including Schlotzsky's – was not proven. We find sufficient evidence, though, that it was likely that Sterling's violations of the Lanham Act damaged Schlotzsky's. The injury element of the claim was satisfied.

The district court did not err in awarding injunctive relief without finding a precise measure of monetary damages.

III. Exceptional Case Warranting Attorney Fees

The Lanham Act provides that a "court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. §1117(a). The court ordered Sterling to pay $96,304.50[2] in attorney fees, an award to which Sterling takes exception because it finds this case not to be exceptional.

An award of attorney fees under the Lanham Act is reviewed for an abuse of discretion. Proctor & Gamble Co. v. Amway Corp., 280 F.3d 519, 528 (5th Cir. 2002). The findings of the district court regarding the exceptional nature of a case are reviewed for clear error. Id. The prevailing party has the burden to demonstrate the exceptional nature of the case by clear and convincing evidence.

---

[2] Schlotzsky's requested $128,406 in attorney fees, but the district court decided that the amount should be reduced by twenty-five percent because Schlotzsky's did not wholly prevail on its claim due to its inability to prove monetary damages with particularity.

Id. at 526. An exceptional case involves acts that can be called "malicious," "fraudulent," "deliberate," or "willful." Seven-Up, 86 F.3d at 1390.

The district court awarded the fees to Schlotzsky's after it had "conducted an independent examination of the testimony and other evidence presented at trial, including through observation of the witnesses' words, demeanor, and candor or lack thereof." The court was also mindful of the jury's finding that Sterling willfully violated the Lanham Act through false designation of affiliation, sponsorship, or approval with respect to Sterling's misrepresentation of its relationship and authority. The district court agreed that Sterling acted in bad faith and willfully violated the Lanham Act.

There is evidence to support the district court's finding that Sterling acted in bad faith. Finding this to be an exceptional case was not clearly erroneous. The decision to award attorney fees was not an abuse of discretion.

IV.    Injunctive Relief

Sterling argues that the injunction granted against it was improper because the district court did not make, nor could it have made, findings concerning irreparable harm or threatened future conduct. Sterling argues that further harm to Schlotzsky's is implausible because Sterling is no longer in business and ceased to do business with franchisees on June 30, 2005. In addition, Sterling contends that Federal Rule of Civil Procedure 52(a) required that the district court make specific findings as to irreparable harm because a jury did not assist the district court judge in making this determination.

Schlotzsky's still insists on the necessity of an injunction because also enjoined are Sterling's principals and any successor entity that they may own in the future. Richard Jeffrey, President of Sterling, began operating a new supply chain management company under the name Global Food Services after ceasing to operate the Sterling entity.

13

The denial or grant of a permanent injunction is reviewed for an abuse of discretion. Peaches Entertainment Corp. v. Entertainment Repertoire Assocs., Inc., 62 F.3d 690, 693 (5th Cir. 1995). An abuse of discretion occurs if the district court "(1) relies on clearly erroneous factual findings when deciding to grant or deny the permanent injunction, (2) relies on erroneous conclusions of law when deciding to grant or deny the permanent injunction, or (3) misapplies the factual or legal conclusions when fashioning its injunctive relief." Id. In the context of Section 43(a), permanent injunctive relief may be granted where a plaintiff demonstrates "that a commercial advertisement or promotion is . . . literally false" and "that it will suffer irreparable harm if the injunction is not granted." Logan, 263 F.3d at 465 (quoting Seven-Up, 86 F.3d at 1390) (internal quotation marks omitted).

With these principles guiding us, we turn to Sterling's challenges to the injunction. Specific findings under Rule 52(a) are required to explain a judgment after a bench trial or an interlocutory order; a "request for a permanent injunction at the conclusion of a jury trial does not trigger this rule." Dresser-Rand Co. v. Virtual Automation, Inc., 361 F.3d 831, 847 (5th Cir. 2004). This Court has not found error when a district court implicitly finds that a litigant would suffer irreparable harm. ICEE Distribs, Inc. v. J&J Snack Foods Corp., 325 F.3d 586, 596 (5th Cir. 2003).

The district court found that each of Sterling's misrepresentations was literally false. In addition, the court found that the misrepresentations were willfully made in bad faith to further Sterling's business interests. Sterling solicited business and promoted supply services using literally false statements. Of concern to the district court was the evidence that Sterling's principal now operates a new franchise supply chain business. The district court tailored the injunctive relief to cover the specific concern that Schlotzsky's may suffer harm from a renewal of Sterling's or its principal's misrepresentations. The injunction

prohibits Sterling's affiliates from engaging in the kind of misrepresentations that Sterling repeatedly used to advance its business position. The district court did not abuse its discretion in granting permanent injunctive relief.

V.     Sterling's Tortious Interference Claims

We have found no error in the district court's imposing of liability on Sterling under the Lanham Act. We now turn to the grounds on which Sterling argues its claims against Schlotzsky's were improperly denied.

First, Sterling alleges that the district court erred when it granted judgment as a matter of law with respect to Sterling's state law claims for tortious interference with its contracts. Sterling argues that it presented sufficient evidence of this tort by proving that Schlotzsky's required franchisees to purchase ninety-five percent of their products from SYGMA and COI. That requirement is said to be economic duress against parties that had contracted with Sterling, duress which convinced them to abandon those contracts.

Preliminarily, we note Schlotzsky's argument that Sterling never pled the issue of duress. A party must place an opposing party on notice of a claim. Fed. R. Civ. Proc. 8(a); EPCO Carbon Dioxide Prods., Inc. v. JP Morgan Chase Bank, NA, 467 F.3d 466, 470 (5th Cir. 2006). An issue not pled also may be tried by consent. Fed. R. Civ. P. 15(b). We find that the allegations in Sterling's pleadings and the evidence that Schlotzsky's required franchisees to use SYGMA and COI adequately preserve the issue of tortious interference for our review.

In reviewing the propriety of a trial court's grant of a Rule 50 motion for judgment as a matter of law, we:

> review all of the evidence in the record, draw all reasonable inferences in favor of the nonmoving party, and may not make credibility determinations or weigh the evidence. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. While we review the record as a whole, we must disregard all evidence favorable to the moving party that the jury is not

required to believe. Thus, we are required to give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.

Palasota v. Haggar Clothing Co., 499 F.3d 474, 480-81 (5th Cir. 2007) (internal quotation marks and citations omitted).

That review standard must be applied to any record evidence of the elements of the tort of economic duress as defined under Texas law. We have previously analyzed Texas law to require this: (1) a threat to do something beyond the legal right of the party making the threat; (2) an "illegal exaction or some fraud or deception" occurs; and (3) a restraint arises that is "imminent" and destroys "free agency without present means of protection." Beijing Metals & Minerals Import/Export Corp. v. Am. Business Ctr., Inc., 993 F.2d 1178, 1184-85 (5th Cir. 1993). The Texas precedents also hold that "the opposing party must be responsible for the financial distress." Id. at 1185.

In one precedent, this Court affirmed summary judgment in favor of Wal-Mart because the plaintiff failed to present any evidence of economic duress. Lee v. Wal-Mart Stores, Inc., 34 F.3d 285, 287 (5th Cir. 1994). Wal-Mart sent Lee a commitment letter to execute a lease, but continued to negotiate specific terms. Id. at 289. Wal-Mart eventually cancelled the lease. Id. Lee argued that he had no choice but to sign a less favorable lease because the bank notes on his property were coming due. Id. The district court concluded, and we affirmed, that Wal-Mart was "free to pursue its own interests in negotiating leases, even if the negotiations result in a perceived bad deal for the other party." Id. at 290.

In another precedent cited by Sterling, we affirmed the district court's grant of summary judgment because there was no evidence presented on any element of duress. Beijing Metals, 993 F.2d at 1185. American Business claimed that absent its agreement to new conditions with its supplier with whom

it had been in dispute over the quality of the products, it would suffer a substantial economic loss on the defective goods it had already received. Id. at 1184. However, the supplier had the right to seek a payment plan for the past-due amounts on previously-sent goods; the buyer could pursue legal remedies on its disputes regarding quality. Consequently, American Business "failed to provide probative evidence indicating it lacked a reasonable alternative to signing" the agreement at issue. Id. at 1185.

These two cases set out the law that is to be applied. In dismissing Sterling's intentional interference claim, the district court found the following:

> Schlotzsky's and its franchisees had the right to enter into these contracts; and therefore, the conduct of Schlotzsky's was certainly reasonable under the circumstances.
>
> But additionally, any damage verdict should the jury find intentional interruption and interference with contracts of Sterling would be wholly speculative. They would have to infer that Sterling would have stayed in the market. They would have had to infer what products they would have been able to sell. There's no evidence of any of that. They would have to just pick a figure out of the air, and then, they would have to discount it. And there's simply no evidence in this record that would justify any jury verdict of damages on that cause of action.

This reasoning is persuasive. Schlotzsky's had the legal right to execute the contracts with SYGMA and COI. Such contracts are standard and are a significant part of what makes franchising financially attractive. Specifically, in a pre-trial order, the trial court found that Sterling had admitted at a hearing that Schlotzsky's had the right to set quality standards for its products, and also had the right to approve all suppliers and distributors of their branded products.[3] Consequently, Schlotzsky's insistence that franchisees abandon other

---

[3] We note that a franchisor has a responsibility imposed by the Lanham Act to protect the integrity and goodwill of its licensed trademark by controlling the quality of products sold under that trademark. 15 U.S.C. §§ 1055, 1127; II JOSEPH P. BAUER & WILLIAM H. PAGE (ED), KINTNER FEDERAL ANTITRUST LAW, §13.31, 304-305 (2002).

arrangements and begin exclusive dealing with the applicable distributor for their region was within its contractual rights.

In addition, the non-exclusive and revocable nature of Schlotzsky's authorization with Sterling allowed Schlotzsky's to pursue its own financial interests, even if unfavorable to Sterling. What Sterling lost when the franchisees turned to SYGMA and COI was its interests under revocable agreements with the franchisees. There was not any threat or commission of an act that was beyond Schlotzsky's legal rights. Sterling lost what it was always legally vulnerable to losing.

A separate issue is raised of whether Sterling ever presented evidence by which lost profits could be measured. Because of our finding that there was no evidence to support the other elements of the tort, we need not address damages.

The district court properly granted the Rule 50 judgment with respect to Sterling's state law claims for tortious interference with its contracts.

VI. Sterling's Antitrust Claims

The district court granted judgment as a matter of law on Sterling's antitrust claims. Sterling argues the judgment was error because when Schlotzsky's required franchisees to enter into the participation agreements, an illegal tying arrangement was created under the Sherman Act. 15 U.S.C. § 1.

The principal authority on which Sterling relies is Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451 (1992). In that case, the Supreme Court defined a tying arrangement in this way:

> "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." Northern Pacific R. Co. v. United States, 356 U.S. 1, 5-6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Such an arrangement violates § 1 of the Sherman Act if the seller has "appreciable economic power" in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market.

Id. at 461-62.

At issue in Kodak was the company's policy of selling machines and parts only to purchasers who would also use Kodak to service their machines. Id. at 458. This policy largely prevented non-Kodak companies from accessing Kodak parts. Such limits would prevent other companies from servicing Kodak equipment. Kodak agreed with original equipment manufacturers that parts fitting Kodak equipment would only be sold to the Kodak company, excluding independent service providers. Kodak limited the availability of used Kodak machines and pressured companies not to sell Kodak parts to independent service providers. The result of Kodak's efforts was that customers were forced to obtain service and repairs from Kodak because the independent service providers were unable to obtain parts. Id.

Independent service providers sued Kodak, alleging that Kodak had violated antitrust laws by tying the sales of parts and service together for Kodak machines. Id. at 459. The independent service providers presented direct evidence that "Kodak has market power to raise prices and drive out competition in the aftermarkets . . . ." Id. at 477. The Supreme Court noted that evidence was also presented "to infer that Kodak chose to gain immediate profits by exerting that market power where locked-in customers, high information costs, and discriminatory pricing limited and perhaps eliminated any long-term loss." Id. at 477-78. The Supreme Court found that these facts could support a violation of the Sherman Act. Id. at 479-80.

Sterling argues that Schlotzsky's also engaged in "lock-in" conduct. In this view, Schlotzsky's tied the right to use its trademark to the purchase of specific products, forcing franchisees to purchase both proprietary and non-protected products on terms that they would not otherwise have accepted. Sterling had some evidence that a few franchisees were reluctant to enter into the new

contracts, though there was substantial evidence as well that the financial benefits to the struggling franchises of the new arrangement was clear.

A post-Kodak interpretation of tying arrangements was handed down by the Supreme Court in 2006. Illinois Tool Works, Inc. v. Indep. Ink, Inc., 547 U.S. 28 (2006). The Court concluded that many "tying arrangements, even those involving patents and requirements ties, are fully consistent with a free, competitive market." Id. at 45. The Court also stated that while tying arrangements "are still unlawful, such as those that are the product of a true monopoly or a marketwide conspiracy, that conclusion must be supported by proof of power in the relevant market rather than by a mere presumption thereof." Id. at 43-44 (internal citation omitted).

> [T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms.

Id. at 34-35 (quoting Jefferson Parish Hospital Dist. No. 2 v. Hyde, 466 U.S. 2, 12 (1984) (internal quotation marks omitted)).

Though there is some logic to Sterling's application of the phrase "tying arrangement" to the requirement that Schlotzsky's imposed on its franchisees to contract only with SYGMA and COI, it is obvious from these precedents that in the Sherman Act context, there is much more to "tying" under antitrust law than the words in their everyday usage suggests.

Sterling's argument that product-purchasing contracts for franchisees should be analyzed as tying arrangements is inconsistent with prior analysis of the Sherman Act. As stated in the precedent on which Kodak relied for its definition of a tying arrangement, such agreements "are unreasonable in and of themselves whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied

product and a 'not insubstantial' amount of interstate commerce is affected."
Northern Pacific, 356 U.S. at 6 (cited in Kodak, 504 U.S. at 462). A significant
flaw in Sterling's argument is that there has been no proof, and indeed it is
unlikely, that a substantial amount of interstate commerce was affected by
Schlotzsky's efforts to get potato chips, sauce, and bread products sold at its
franchises purchased through one of two distributors.

In addition, an example which follows in Northern Pacific immediately
after what we have just quoted is apt:

> Of course where the seller has no control or dominance over the
> tying product so that it does not represent an effectual weapon to
> pressure buyers into taking the tied item any restraint of trade
> attributable to such tying arrangements would obviously be
> insignificant at most. As a simple example, if one of a dozen food
> stores in a community were to refuse to sell flour unless the buyer
> also took sugar it would hardly tend to restrain competition in sugar
> if its competitors were ready and able to sell flour by itself.

Northern Pacific, 356 U.S. at 6-7. Sterling might argue that the proper
understanding of the grocery store analogy is to consider the relevant market as
the narrow universe of Schlotzsky's franchises; all dozen food stores that the
analogy posits are Schlotzsky's stores. To the contrary, the Schlotzsky's universe
was created by contract and not by dominance of a market. A franchisor usually
exercises control not through market power but by voluntary agreement.

This conclusion does not deny the existence of some of the traditional
elements of antitrust violations in the franchise arrangement. Indeed, expert
commentators have phrased the similarity this way:

> At one level, there is no meaningful difference in evaluating
> antitrust issues – including tying arrangements – regardless of
> whether the parties are merely a seller and its customers or a
> franchisor and its franchisees . . . . The key question in any
> antitrust situation is the impact on competition of the particular
> activity . . . .

KINTNER, supra n.3, §13.37, 311. This first level of analysis then gives way to the more important level, which is the understanding that a franchise relation is a symbiotic one. The success of franchisor and franchisee are interrelated, making more nuanced the evaluation of what superficially could be described as tying arrangements:

> [T]he fact that a tying arrangement arises in a franchising context will affect both the evaluation of the competitive effects of the arrangement . . . and also the applicability of certain defenses. Among the issues raised are whether there are one or two products involved in the arrangement [i.e., are the trademark and a product sold at the franchise one or two products?]; whether the franchisor has coerced its franchisees to take the tied product; whether the franchisor has the requisite economic power in the tying product market; and, as noted, the application of defenses . . . .

Id. at 312.

We find the analysis of the Third Circuit in a dispute with some similarities to our own to be instructive. Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 438 (3d Cir. 1997). There, several pizza franchisees alleged that their being required to buy most of their ingredients such as fresh dough from their franchisor was an illegal tying arrangement, citing Kodak as a key precedent. The court found no antitrust violation, both because the franchisor did not have the requisite economic power and because the franchise agreement gave the franchisor the right to insist on the single-source distribution. Id at 442-43. As we have noted already, Sterling acknowledged that Schlotzsky's had the contractual right to require franchisees to purchase from a specific distributor. That contract power is distinguishable from market power such as in Kodak that more readily may be classified as leading to an illegal tying arrangement.

This Court has previously explained that "[e]conomic power derived from contractual agreements such as franchises or [an] agents' contract . . . has

22

nothing to do with market power, ultimate consumers welfare, or antitrust." United Farmers Agents Ass'n. v. Farmers Ins. Exch., 89 F.3d 233, 236-37 (5th Cir. 1996) (internal quotation marks omitted). This contract power is essential to a franchise operation such as the one at issue here.

> The essence of a successful nationwide fast-food chain is product uniformity and consistency. Uniformity benefits franchisees because customers can purchase pizza from any Domino's store and be certain the pizza will taste exactly like the Domino's pizza with which they are familiar. This means that individual franchisees need not build up their own good will. Uniformity also benefits the franchisor. It ensures the brand name will continue to attract and hold customers, increasing franchise fees and royalties.

Queen City Pizza, 124 F.3d at 433.

Sterling's exclusion from future business with Schlotzsky's franchisees was a termination that was consistent with Sterling's status as a non-exclusive supply chain manager. Even if Schlotzsky's required franchisees to turn from Sterling to SYGMA and COI as part of the franchisees' continuation of doing business under that name, such a requirement was not an antitrust "tying arrangement" because it was not an exercise of market power but of contract power. The reasoning of the district court as to Sterling's claim is persuasive:

> [T]here is no evidence, not even insufficient, but no evidence to submit any theory of antitrust in this case. I have no evidence of any relevant market, any impact on the relevant market. I have no evidence of any anti-competitive injury other than one entity not able to sell wares after becoming a non-approved, following his nonexclusive approved rights. I have no antitrust injury in the sense of anti-competition.

Antitrust claims are best reviewed on a case-by-case basis, focusing on the "particular facts disclosed by the record." Kodak, 504 U.S. at 467 (quoting Maple Flooring Mfrs. Ass'n. v. United States, 268 U.S. 563, 579 (1925)). Relevant inquiry includes a close examination of the "economic reality of the market at issue." Kodak, 504 U.S. at 467.

Far from being anti-competitive, Schlotzsky's efforts to return its troubled franchises to profitability benefitted competition by avoiding the disappearance of the Schlotzsky's brand stores. The record demonstrates that by the end of June 2005, ninety-nine percent of franchisees had signed supply agreements with SYGMA and COI. The few that had not yet signed were free to continue their restaurant business, but would have to leave the Schlotzsky's system. After the new distribution system under SYGMA and COI was instituted, some franchisees experienced a twenty percent sales increase. There was evidence that increased sales partly resulted from additional advertising. The evidence supports that Schlotzsky's actions were a good faith effort to see each franchisee prosper. Competition in the market was improved by the exercise of Schlotzsky's contract power in its small part of the relevant market. Sterling presented no evidence that market power was at work.

The district court properly granted judgment as a matter of law with respect to Sterling's antitrust claims.

The judgment of the district court is AFFIRMED.